UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
OMAR MALCOLM, KARVEN ALCINDOR, ANTHONY
APONTE, SHIRLENE BLAIR, DERYCK CHARLES,
LATIF CORNELIUS, LANAE CURRY, JOSE DEJESUS,
SHAKIYNA ESPINO, ROBERTO FERNANDEZ,
VLAJEMY FRANCOIS, CRYSTAL GARNETT, CHANTEL
GOUVEIA, APRIL HERNEY-KOSAKOWSKI, TAMELLE
HILLIARD, YOLANDA HOLMES, MONIQUE JOHNSON,
KEYSHA LEWIS, CAROLYN MARAJ, HUZIRAN
MOZEB, ZHIHUI PU, DAVID RUDDOCK, MYRLINE
ULYSSES, and BRICE WILLIAMS, individually and on          Case No:  20-cv-09641
behalf of all others similarly situated,                                      (ALC)(SDA)

                                              Plaintiffs,

                     -against-


THE CITY OF NEW YORK,

                                              Defendant.
--------------------------------------------------------------------------X


### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR UNOPPOSED MOTION FOR APPROVAL OF COLLECTIVE ACTION SETTLEMENT


Law Offices of Paul A. Pagano, P.C.          Law Offices of Jason L, Abelove, P.C.
*Attorneys for Plaintiffs*                            *Attorneys for Plaintiffs*
100 Duffy Ave, Suite 510                          666 Old Country Road, Suite 303
Hicksville, NY 11801                                Garden City, NY 11530
(917) 589-1479                                        (516) 222-7000

Law Offices of Yale Pollack, P.C.
66 Split Rock Road
Syosset, New York 11791
(516) 634-6340

Of Counsel:    Paul A. Pagano, Esq.
                      Jason Abelove, Esq.
                      Yale Pollack, Esq.

## TABLE OF CONTENTS

Page(s)

**PRELIMINARY STATEMENT** ................................................................. 1

**FACTUAL AND PROCEDURAL BACKGROUND** ........................................... 1

    I. Factual Allegations ................................................................. 1

        A. Late Paid and Unpaid Overtime ....................................... 1
        B. Retaliation against ADW Malcolm .................................... 3
        C. DOC's Position ........................................................ 4

    II. Procedural History, Discovery, and Settlement ............................. 4

        A. Procedural History ..................................................... 4
        B. Discovery ............................................................... 5
        C. Negotiations ............................................................ 5

**SETTLEMENT TERMS** ...................................................................... 6

    I. The Settlement Sum ....................................................... 6
    II. Settlement Collective-Eligible Employees ................................ 6
    III. Notice Process ........................................................... 7
    IV. Settlement Awards ........................................................ 8
    V. Attorneys' Fees .......................................................... 9
    VI. Claims Administration .................................................... 9

**ARGUMENT** .................................................................................. 9

    I. A One-Step Approval Process Is Appropriate for FLSA Settlements ........... 9

    II. The Proposed Settlement Should Be Approved Because
        It Is Fair and Reasonable ............................................... 10

        A. Settlement Plaintiffs' range of possible recovery weighs
            in favor of approving the settlement ............................... 11

        B. The extent to which the settlement will enable the parties
            to avoid anticipated burdens and expenses in establishing
            their respective claims and defenses weighs in favor of
            approving the settlement................................................ 13

*i*

**Page(s)**

C.  The seriousness of the litigation risks faced by the parties weighs in favor of approving the settlement ........................................ 14

D.  The fact that the settlement agreement is the product of arm's length bargaining between experienced counsel weights in favor of approving the settlement ....................................... 15

E.  The fact that there was no fraud or collusion weights in favor of approval of the settlement ....................................................... 17

F.  There are no inappropriate provisions in the agreement ..................... 17

III.  <u>Plaintiffs' Counsel's request for attorneys' fees and costs should be granted</u> ........................................................................ 17

A.  Plaintiffs' counsel's request for 1/3 of the settlement sum, which will notably come only from liquidated damages, is supported by the pertinent retainers, opt-in forms and an additional declaration of the Settlement Plaintiffs ........................... 17

B.  Plaintiffs' counsel's request for 1/3 of the settlement sum is overwhelmingly supported by Second Circuit case law .................. 19

C.  The Goldberger factors that many Courts look at when determining the reasonableness of an attorney fee award support an award of one-third of the Gross Sum ............................ 21

    1.  Plaintiffs' Counsel's Time And Labor .......................................... 21
    2.  The Litigation's Magnitude And Complexity ............................ 24
    3.  The Risks Of Litigation .............................................................. 25
    4.  Quality Of The Representation ................................................... 26
    5.  The Fee Is Reasonable In Relation To The Settlement .............. 27
    6.  Public Policy Considerations ...................................................... 28

D.  The Lodestar, Which Is Only To Be Used As a Loose Cross-Check At Most, Further Supports An Award To Class Counsel Of One-Third Of The Settlement Fund ........................ 28

E.  Plaintiffs' counsel is entitled to reimbursement for litigation expenses ...................................................................................... 34

F.  The Settlement Administrator should be approved ................................ 34

**<u>CONCLUSION</u>** ......................................................................................... 34

*ii*

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Almanzar v Silver Star Props. Corp.*,
2023 US Dist LEXIS 190516, at *5, *6-8 (SDNY Oct. 24, 2023)...........................    28, 29

*Anyoku v World Airways (In re Nig. Charter Flights Litig.*,
2011 US Dist LEXIS 155180, at *18 (EDNY Aug. 25, 2011)..................................     27

*Asare v Change Group NY, Inc.*,
2013 US Dist LEXIS 165935, at *45-46 (SDNY Nov. 15, 2013)...........................     21

*Barrentine v. Arkansas–Best Freight Sys., Inc.*,
450 U.S. 728, 743 (1981).............................................................     23

*Beckman v KeyBank, N.A.*,
293 FRD 467, 479, 482 (SDNY 2013).........................................................    25, 29, 30

*Blizzard v. Astrue*,
496 F. Supp. 2d 320, 325 (S.D.N.Y. 2007)................................................     29

*Braunstein v. Hudson Hall*,
19-cv-7983 (SDNY May 2021)......................................................................     33

*Brown v Sisense, Inc.*,
80 Misc 3d 1221[A], 2023 NY Slip Op 51055[U],
*3 (Sup Ct, Kings County 2023)................................................................     10

*Campos v. Goode*,
2011 U.S. Dist. LEXIS 22959, at *16 (S.D.N.Y. Mar. 4, 2011).................................     16

*Castagna v Madison Sq. Garden, L.P.*,
2011 US Dist LEXIS 64218, at *30 (SDNY June 7, 2011).........................................     21

*Clark v. Ecolab Inc.*,
Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672,
2010 WL 1948198, at *4-*8 (S.D.N.Y. May 11, 2010)................................     25

**Cases**                                                                                                    **Page(s)**

*Colgate-Palmolive Co. ERISA Litig.*,
36 F Supp 3d 344, 352 (SDNY 2014)...................................................................      28

*Davis v J.P. Morgan Chase & Co.*,
827 F Supp 2d 172, 178 (WDNY 2011)..............................................................      19

*DeLeon v Wells Fargo Bank, N.A.*,
2015 US Dist LEXIS 65261, at *10 (SDNY May 7, 2015).......................................      10

*Frank v. Eastman Kodak Co.*,
228 F.R.D. 174, 189 (W.D.N.Y. 2005).................................................................      25

*Fujiwara v. Sushi Yasuda Ltd.*,
58 F. Supp. 3d 424, 439 (S.D.N.Y. 2014).............................................................      30, 32

*Garcia v Atlantico Bakery Corp.*,
2016 US Dist LEXIS 84631, at *2-4 (SDNY June 29, 2016)...................................      19

*Goldberger v Integrated Resources*,
209 F3d 43, 50 (2d Cir 2000)..............................................................................      21, 29

*Hadel et al. v. Gaucho LLC et al.*,
No. 15 Civ. 3706 (RLE), hr'g tr. at p. 9-10 (S.D.N.Y. June 30, 2016)........................      20, 30

*Hadel*, 2016 WL 3647600, at *1..........................................................................      33

*Hart v RCI Hospitality Holdings*,
2015 US Dist LEXIS 126934, at *42 (SDNY Sep. 22, 2015)...................................      26

*Karic v Major Auto. Cos.*,
2016 US Dist LEXIS 57782, at *27 (EDNY Apr. 27, 2016)......................................      21

*Khait v. Whirlpool Corp.*,
No. 06 Civ. 6381, 2010 U.S. Dist. LEXIS 4067, 2010 WL 2025106,
at *8 (E.D.N.Y. Jan. 20, 2010)............................................................................      19

**Cases**                                                                                            **Page(s)**

*Khan v. Young Adult Inst., Inc.,*
2018 U.S. Dist. LEXIS 202494, 2018 WL 6250658,
at *4-5 (S.D.N.Y. Nov. 29, 2018)..................................................................................     12

*King v. Fox,*
2004 U.S. Dist. LEXIS 462, 2004 WL 68397, at *5 (S.D.N.Y. Jan. 14, 2004)..............     29

*McClean v. Health Sys. Inc.,*
No. 6:11-cv-03037-DGK, Doc. 168-1 (W.D. Mo. Feb. 8, 2012)....................................     7

*Mercado v Metro. Transp. Auth.,*
2023 US Dist. LEXIS 115254, at *6, n 3 (SDNY July 5, 2023)....................................     7

*Meza v 317 Amsterdam Corp.,*
2015 US Dist LEXIS 166890, at *5 (SDNY Dec. 14, 2015)...........................................     33

*Pena v. LeCirque, Inc.,*
14 Civ. 7541 (FM), hr'g tr. at pg. 7-8 (S.D.N.Y. Jan. 21, 2016)....................................     33

*Puglisi v. TD Bank, N.A.,*
No. 14 Civ. 02740 (AT) (GWG), hr'g tr. at p. 10-12 (E.D.N.Y. July 30, 2015)..............     33

*Ramos v DNC Food Serv. Corp.,*
2022 US Dist LEXIS 35181, at *6 (SDNY Feb. 25, 2022)............................................     33

*Raniere v. Citigroup, Inc.,*
310 F.R.D. 211, 221 (S.D.N.Y. 2015)..........................................................................     21

*Romero v La Revise Assoc., L.L.C.,*
58 F Supp 3d 411, 421 (SDNY 2014)............................................................................     10

*Salinas v. U.S. Xpress Enters., Inc.,*
No. 1:13-CV-00245-TRM-SKL, Doc. 52-1 at 1 (E.D. Tenn. Sept. 10, 2014)..............     8

*Savoie v. Merchants Bank,*
166 F.3d 456, 460-61 (2d Cir. 1999).............................................................................     20

*Scott v. City of New York,*
643 F.3d 56, 59 (2d Cir. 2011).......................................................................................     22

*v*

**Cases**                                                                                    **Page(s)**

*Sewell v Bovis Lend Lease LMB, Inc.,*
2012 US Dist LEXIS 53556, at *37-38 (SDNY Apr. 16, 2012)........................    30

*Solis v Orthonet LLC,*
 2021 US Dist LEXIS 122512, at *10 (SDNY June 30, 2021).........................    33

*Sukhnandan v Royal Health Care of Long Is. LLC,*
2014 US Dist LEXIS 105596, at *22-23; *43 (SDNY July 31, 2014)...........................    10, 34

*Sumitomo Copper Litigation,*
74 F. Supp. 2d 393, 399 (1999)........................................................    28

*Sykes v Mel Harris & Assoc., LLC,*
2016 US Dist LEXIS 74566, at *48 (SDNY May 24, 2016)............................    32

*Taft v Ackermans,*
2007 US Dist LEXIS 9144, at *31 (SDNY Jan. 31, 2007).............................    26

*Tiro v Pub. House Invs., LLC,*
2013 US Dist LEXIS 129258, at *31, *46 (SDNY Sep. 10, 2013)................................    10

*Velez v. S.T.A. Parking Corp.,*
23 Civ. 4786 (AT), at *2 (S.D.N.Y. Dec. 14, 2023).........................................    11

*Velez v S.T.A. Parking Corp.,*
2024 US Dist LEXIS 24280, at *9, n 2 (SDNY Feb. 12, 2024)......................    33

*Wal-Mart Stores, Inc. v Visa U.S.A. Inc.,*
396 F3d 96, 121, 122 (2d Cir 2005)..................................................    20

*Westerfield v. Wash. Mut. Bank,*
Nos. 06 Civ. 2817, 08 Civ.0287, 2009 U.S. Dist. LEXIS 94544,
2009 WL 5841129, at *4-5 (E.D.N.Y. Oct. 8, 2009).........................................    19-20

*Weston v TechSol, LLC,*
2018 US Dist LEXIS 166574, at *28 (EDNY Sep. 26, 2018).........................    10

*Willix v Healthfirst, Inc.,*
2011 US Dist LEXIS 21102, at *15-16 (EDNY Feb. 18, 2011)......................    19

**Cases**                                                                                                    **Page(s)**

*Yuzary v HSBC Bank USA, N.A.,*
2013 US Dist LEXIS 144327, at *29-30 (SDNY Oct. 2, 2013)........................................... 21, 30

*Zeltser v Merrill Lynch & Co.,*
2014 US Dist LEXIS 135635, at *22 (SDNY Sep. 23, 2014)................................................ 30

*Zorn-Hill v A2B Taxi LLC,*
2020 US Dist LEXIS 170608, at *13-14 (SDNY Sep. 17, 2020)......................................... 19

## PRELIMINARY STATEMENT

Subject to Court approval, Plaintiffs Omar Malcolm, Karven Alcindor, Anthony Aponte, Shirlene Blair, Deryck Charles, Latif Cornelius, Lanae Curry, Jose DeJesus, Shakiyna Espino, Roberto Fernandez, Vlajemy Francois, Crystal Garnett, Chantel Gouveia, April Herney-Kosakowski, Tamelle Hilliard, Yolanda Holmes, Monique Johnson, Keysha Lewis, Carolyn Maraj, Huziran Mozeb, Zhihui Pu, David Ruddock, Myrline Ulysses, and Brice Williams (collectively "Named Plaintiffs"), individually and on behalf of the conditionally certified collective they represent, and the City of New York ("DOC" or "Defendant"), have, subject to the Court's approval, settled this Fair Labor Standards Act ("FLSA") wage and hour collective/retaliation action for $6,200,000. The settlement satisfies all criteria for approval of an FLSA collective action settlement because it resolves a *bona fide* dispute and was the result of arm's-length settlement negotiations conducted by counsel well-versed in wage and hour law with the assistance of an experienced mediator.

Accordingly, the Parties respectfully request that the Court enter the Proposed Order approving the $6,200,000 settlement as set forth in the Collective Action Settlement Agreement.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Allegations

#### A. Late Paid and Unpaid Overtime

The 24 Named Plaintiffs and 2,562 opt-in plaintiffs ("Opt-In Plaintiffs") were/are employed by the DOC from November 17, 2017 to December 14, 2023 in the titles of Assistant

---

[1] The Collective Action Settlement Agreement is attached as Exhibit 1 to the Declaration of Jason L. Abelove in Support of Plaintiffs' Unopposed Motion for Approval of Collective Action Settlement Agreement ("Abelove Dec."). Unless otherwise indicated, all exhibits are attached to the Abelove Dec. For the Court's convenience, a Proposed Order is attached as Exhibit 10 to the Abelove Dec.

Deputy Warden, Captain, or Correction Officer and stationed at Riker's Island. Abelove Dec., p. 2, ¶ 4. The Named Plaintiffs and Opt-In Plaintiffs kept track of their time via timesheets. Abelove Dec., p. 2, ¶ 5, 7. They worked/work in excess of 40 hours a week. Abelove Dec., p. 2, ¶ 6. At the end of each daily tour, they submitted tour certification sheets that listed, *inter alia,* all of the overtime they work. Abelove Dec., p. 2, ¶ 7. Their time sheets/tour certification sheets were given to a timekeeper who put the information into a program called CityTime. Abelove Dec., p. 2, ¶ 8. The timesheets/tour certification sheets were submitted to the DOC on a daily basis. Abelove Dec., p. 2, ¶ 9. Named Plaintiffs allege that the DOC does not pay overtime compensation earned in a particular workweek on the regular payday for the period in which such workweek ends. Abelove Dec., p. 2, ¶ 10. Instead, it builds in a lag with respect to the second week of overtime for each bi-weekly pay period. Abelove Dec., p. 3, ¶ 11. By way of example, on January 3, 2014, the DOC paid the regular wages earned during December 15, 2013 to December 28, 2013 and the overtime wages earned during December 8, 2013 to December 21, 2013. Abelove Dec., p. 3, ¶ 11. Overtime earned during the week of December 22-28 was paid in the subsequent paycheck on January 17, 2014 and the Named Plaintiffs allege same is untimely pursuant to the FLSA and 29 C.F.R. § 778.106 which require that the overtime wages earned in a given period be paid in the same paycheck as the regular wages earned for that period. Abelove Dec., p. 3, ¶ 11. In addition, Named Plaintiffs allege that there are substantial overtime wages which are paid later than the one paycheck lag the DOC builds in. Abelove Dec., p. 3, ¶ 12. Using the above example, the overtime wages for the week of December 22st, which were supposed to be paid on January 17, 2014 according to the DOC, are frequently paid much later. Abelove Dec., p. 3, ¶ 12. Further, the Named Plaintiffs allege that there are millions of dollars of unpaid overtime. Abelove Dec., p. 3, ¶ 13.

2

### B. Retaliation against ADW Malcolm

As set forth more fully in the Named Plaintiffs' second amended complaint, the Named Plaintiffs allege that Plaintiff Omar Malcolm was subjected to retaliation for his numerous written and oral complaints regarding the DOC's alleged violations of the FLSA including, but not limited to, an improper transfer, a diminution in the number of overtime hours he was permitted to work, and an unprecedented two-rank demotion in title (from Assistant Deputy Warden to Correction officer) in connection with an assault perpetrated by an inmate on Plaintiff Malcolm. Abelove Dec., p. 3, ¶ 14.

### C. DOC's Position

The DOC denies any and all wrongdoing with respect to the Named Plaintiffs and Opt-in Plaintiffs. In particular, the DOC denies that they paid overtime late or failed to pay overtime and that Plaintiff Malcolm was retaliated against.

## II. Procedural History, Discovery, and Settlement

### A. Procedural History

On November 17, 2020, a subset of the current Named Plaintiffs filed their initial complaint in this action alleging: (1) late paid overtime under the FLSA; (2) unpaid overtime under the FLSA; and (3) retaliation against Plaintiff Malcolm in violation of the FLSA. Docket Entry ("D.E." 1). On February 22, 2021, the Named Plaintiffs filed an amended complaint which included all 24 of the Plaintiffs. D.E. 26. On April 13, 2021, the DOC filed a motion to dismiss the first amended complaint. D.E. 31, 32. Plaintiffs opposed same on May 5, 2021. D.E. 33. On May 19, 2021, the DOC filed its reply. D.E. 37. On or about August 23, 2021, Plaintiffs filed a motion seeking conditional collective certification. D.E. 46, 47, 48. On November 18, 2021, the DOC filed its opposition to the conditional collective certification motion. D.E. 56. Plaintiffs filed their reply

on February 21, 2022. D.E. 65. On March 8, 2022, the Court granted in part and denied in part the DOC's motion to dismiss the first amended complaint. D.E. 67. On April 5, 2022, Plaintiffs filed a motion seeking to amend their complaint and reconsideration of the Court's March 8, 2022 Opinion and Order. D.E. 80,81. On April 12, 2022, the DOC filed its opposition papers. D.E. 82. On April 19, 2022, Plaintiffs filed their reply. D.E. 83. On September 30, 2022, the Court conditionally certified a collective holding, in part, that the Plaintiffs are similarly situated. D.E. 87. On October 12, 2022, the Court denied Plaintiffs' motion for reconsideration but granted Plaintiffs' motion to amend their complaint. D.E. 89. On October 21, 2022, the DOC moved to dismiss Plaintiffs' second amended complaint. D.E. 91, 92. The Plaintiffs opposed on November 14, 2022.

Also, on or about November 14, 2022, notice was sent to thousands of potential collective members at significant expense to Plaintiffs' counsel via third-party administrator Analytics Consulting LLC. Abelove Dec., p. 5, ¶ 22. From November 14, 2022 through March 17, 2023, Plaintiffs' counsel, processed, redacted, catalogued and filed almost 2,600 opt-in forms. D.E. 96-132, 136. Said process included negotiating with Corporation Counsel (the DOC's prior attorney before Jackson Lewis) to permit late opt-ins (a negotiation which permitted dozens of additional opt-ins to participate in the litigation and ultimately this settlement). Abelove Dec., p. 5, ¶ 24.

On June 30, 2023, the Court denied the DOC's motion to dismiss Plaintiffs' second amended complaint. D.E. 138. Plaintiffs' second amended complaint was filed on July 28, 2023, followed shortly thereafter by the DOC's answer. D.E. 139, 140. On August 4, 2023, the matter was referred to mediation. D.E. 141. In or about early August 2023, Jackson Lewis substituted in as counsel for the DOC. Abelove Dec., p. 5, ¶ 27.

4

**B.  Discovery**

Though the Parties did not engage in depositions in this case they did exchange documentation necessary to the resolution of this case. Abelove Dec., p. 5, ¶ 28. More particularly, the DOC provided the Named Plaintiffs with excel spreadsheets containing the overtime paid to the Named Plaintiffs and Opt-in Plaintiffs.  Abelove Dec., p. 5, ¶ 29.  Said records were voluminous containing thousands of lines of code and requiring hours and hours of analysis all of which were done by Plaintiffs' counsel. Abelove Dec., p. 6, ¶ 30.   Such analysis allowed Plaintiffs to arrive at figures for late paid overtime. Abelove Dec., p. 6, ¶ 31.   The DOC also provided the Named Plaintiffs with collective bargaining agreements which, *inter alia*, allowed the parties to determine if the Plaintiffs and Opt-in Plaintiffs were similarly situated across job titles.  Abelove Dec., p. 6, ¶ 32.

**C.  Negotiations**

Negotiations in this matter were arduous, took several months, and spread across two sets of defense counsel.  Abelove Dec., p. 6, ¶ 33.  On or about April 27, 2023, after the DOC's extensive payroll data was analyzed, Named Plaintiffs sent corporation counsel a demand letter setting forth their initial demand.  Abelove Dec., p. 6, ¶ 37.  Thereafter, Plaintiffs' counsel and corporation counsel exchanged several emails and had several calls during which the DOC gave its positions on why Plaintiffs' damages figures were incorrect which included that Assistant Deputy Wardens and Captains were included in the analysis (who the DOC believes are exempt from the FLSA), that certain overtime in the data was contractual rather than FLSA overtime, that certain cash premiums in the data were not FLSA overtime, and that certain companion codes in the data were not FLSA overtime.  Abelove Dec., p. 6, ¶ 35. Thereafter, on June 8, 2023, Plaintiffs sent a revised settlement demand incorporating, for settlement purposes only, the DOC's positions.

Abelove Dec., p. 6, ¶ 36.  In or about August 2023, Jackson Lewis was substituted as counsel for the DOC and raised additional issues concerning offsets to the Named Plaintiffs and Opt-In Plaintiffs' late/unpaid overtime claims. Abelove Dec., p. 6, ¶ 37.

On December 12, 2023, the parties held a full day long mediation with Court appointed mediator Darren Rumack, Esq. who was able to get the parties to resolve the matter for $6,200,000 consisting of $3,000,000 in back pay damages, $3,150,000 in liquidated damages, and $50,000 in damages for Plaintiff Malcolm's retaliation claim. Abelove Dec., p. 7, ¶ 38.  Plaintiffs believe this represents a strong resolution to this over three-and-a-half-year long litigation.  A fact evidenced by the numerous declarations submitted in support of the settlement. Abelove Dec., Exhibit 2.

## SETTLEMENT TERMS

### I. The Settlement Sum

The Collective Action Settlement Agreement establishes a Gross Settlement Sum of $6,200,000 to settle claims against Defendant (the "Gross Sum").   The Gross Sum covers the Named Plaintiffs and Opt-in Plaintiffs' settlement awards, Plaintiffs' Counsel's attorneys' fees and costs, Plaintiff Malcolm's retaliation damages, and the fees and costs of the Settlement Administrator.

### II. Settlement Collective-Eligible Employees

The settlement collective the parties seek to have the Court certify is "all current or former Assistant Deputy Wardens, Captains, and Correction Officers employed by the City of New York/Department of Corrections at Rikers Island at any point from November 17, 2020 to December 14, 2023." The Plaintiffs and Opt-ins ("Settlement Plaintiffs") are all members of that collective and will all receive payments from the settlement sum.

### III.    Notice Process

Within 21 days from the later of the date that the Court enters an Order finally approving this Agreement or the resolution of any appeal therefrom, Defendant shall provide Plaintiffs' Counsel and Analytics Consulting LLC, the retained third-party administrator, with the social security numbers and last known addresses of all Settlement Plaintiffs. Within 30 days thereafter, the Proposed Notice will go out to the Settlement Plaintiffs formally advising them of the settlement of the action and the manner in which they will be paid. Notably, each and every Named Plaintiff has submitted a written authorization permitting Plaintiffs' counsel to "pursue any claims I may have, including such litigation as may be necessary, and I hereby consent, agree, and option to become a plaintiff herein and to be bound by any settlement of this action or adjudication by the Court." Abelove Dec., p. 8, ¶ 42. Likewise, each and every opt-in Plaintiff has submitted a written authorization in which they explicitly provided that "I hereby further authorize and designate the named plaintiffs to act on my behalf concerning the litigation. I agree to be bound by any adjudication of this action by a court, whether it is favorable or unfavorable. I further agree to be bound by any settlement of this action." Abelove Dec., p. 8, ¶ 42. Courts routinely accept such explicit authorizations from plaintiffs as authority to settle the matter on their behalf. *See e.g., Mercado v Metro. Transp. Auth.*, 2023 US Dist. LEXIS 115254, at *6, n 3 (SDNY July 5, 2023) (approving settlement where "456 opt-in Plaintiffs affirmatively executed a consent document that provides explicit authorization for the Named Plaintiffs to settle these specific FLSA wage and hour claims on their behalf[.]")[2]; *McClean v. Health Sys. Inc.*, No. 6:11-

---

[2] Plaintiffs' counsel also wishes to note that an email was sent to all Settlement Plaintiffs for whom we have an email address and advised them of the key settlement terms. Abelove Dec., Exhibit 4. Said email was very well received. Abelove Dec., p. 8, fn 1. Additionally, 16 lead Plaintiffs have submitted declarations in support of the settlement. Abelove Dec., Exhibit 2.

cv-03037-DGK, Doc. 168-1 (W.D. Mo. Feb. 8, 2012) (providing that class members "designate the named Plaintiff(s) and their attorneys as my representatives to make decisions on my behalf concerning the litigation . . . and decisions regarding settlement"); *Salinas v. U.S. Xpress Enters., Inc.*, No. 1:13-CV-00245-TRM-SKL, Doc. 52-1 at 1 (E.D. Tenn. Sept. 10, 2014) (designating class counsel and the named plaintiff as class members' "agents in making decisions on my behalf in this litigation, including entering into settlement agreements pertaining to this matter").

## IV.    Settlement Awards

In addition to the $50,000 apportioned to Plaintiff Omar Malcolm for his retaliation claim, each Settlement Plaintiff including Omar Malcolm will be allocated a proportionate share of the settlement sum based on the number of overtime hours worked during the Pertinent Period (from November 17, 2017 to December 14, 2023).

For each individual Settlement Plaintiff their total number of overtime hours worked during the Pertinent Period will be divided by the total number of overtime hours worked by all Settlement Plaintiffs during the Pertinent Period to arrive at a percentage.[3]  That percentage will be multiplied first by $3,000,000 to determine each Settlement Plaintiff's gross backpay award and second by $3,150,000 less attorneys' fees and costs and administrative costs to arrive at a liquidated damages award.  Each Settlement Plaintiff who has a backpay award above $75 and a liquidated damages award above $25 will have said awards reduced ratably so that each Settlement Plaintiff who would not otherwise receive $75 in back pay and $25 in liquidated damages is awarded same.  The amount of each Settlement Plaintiff's share of the settlement sum will be disclosed to the Settlement Plaintiff in the Notice Packet.

---

[3] The Named Plaintiffs, who have spent 3 years assisting in the litigation of this case by providing information for the complaint, providing documentation and providing information regarding the DOC's alleged defenses, will have their numerator multiplied by 3.

## V.    Attorneys' Fees

Under the Settlement Agreement, subject to Court approval, Plaintiffs' Counsel requests the return of their costs: (1) $22,000 in administrative costs associated with disseminating the original opt-in notices to over 12,000 potential members via third-party vendor Analytics Consulting, LLC; and (2) $2,500 in fees to Plaintiffs' expert for calculations in connection with the settlement, as well as 1/3 of the remaining Gross Sum amounting to $2,058,500 as attorneys' fees.

## VI.    Claims Administration

Plaintiffs have retained Analytics Consulting LLC, an experienced wage and hour claims administrator, to serve as the settlement administrator. Abelove Dec., p. 9, ¶ 44.   The settlement administrator's fees are expected to be $30,000, which will be paid from the Gross Sum. Abelove Dec., Exhibit 5. The fees will cover, among other things, preparing the notice, making payments due to Settlement Plaintiffs, updating addresses for Settlement Plaintiffs, distributing Court-approved attorneys' fees and costs to Plaintiffs' counsel, providing tax forms as required under the Collective Action Settlement Agreement and applicable law, establishing, controlling, and maintaining the Qualified Settlement Fund (QSF), and filing all required tax returns for the QSF and paying all taxes due. To the extent the Court approves $30,000 and actual costs are less the balance will be distributed to the Settlement Plaintiffs.

## ARGUMENT

## I.    A One-Step Approval Process Is Appropriate for FLSA Settlements

The Settlement Plaintiffs request that the Court approve the settlement of their FLSA claims. "The standard for approval of an FLSA settlement is significantly lower than for a Rule 23 settlement because an FLSA settlement does not implicate the same due process concerns as a

Rule 23 settlement." *Tiro v Pub. House Invs., LLC*, 2013 US Dist LEXIS 129258, at *31 (SDNY Sep. 10, 2013). "Courts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes." *DeLeon v Wells Fargo Bank, N.A.*, 2015 US Dist LEXIS 65261, at *10 (SDNY May 7, 2015). If the proposed settlement reflects a reasonable compromise of the contested issues, the court should approve the settlement. *Id.*

Here, the parties, via experienced wage and hour counsel, litigated this case for over three years before reaching a settlement. Such litigation included motions to dismiss, a motion for conditional certification, and the exchange of documents pertaining to job responsibilities and damages. The parties' litigation efforts ultimately led them to a months' long negotiation process which culminated in a day long mediation with a Court appointed mediator who guided the parties towards an amicable resolution. Therefore, FLSA approval is warranted. *See, e.g., Romero v La Revise Assoc., L.L.C.,* 58 F Supp 3d 411, 421 (SDNY 2014); *Sukhnandan v Royal Health Care of Long Is. LLC,* 2014 US Dist LEXIS 105596, at *22-23 (SDNY July 31, 2014).

In approving a settlement for an FLSA collective action, a one-step settlement approval process is widely recognized as the appropriate procedure. *See, e.g., Brown v Sisense, Inc.*, 80 Misc 3d 1221[A], 2023 NY Slip Op 51055[U], *3 (Sup Ct, Kings County 2023); *Weston v TechSol, LLC,* 2018 US Dist LEXIS 166574, at *28 (EDNY Sep. 26, 2018)(granting a motion for settlement approval and attorneys' fees, as well as simultaneously authorizing distribution to the settlement collective).

## II.   The Proposed Settlement Should Be Approved Because It Is Fair and Reasonable

In determining whether an FLSA settlement agreement is fair Courts look to the following factors:

> (1) the plaintiff's range of possible recovery; (2) the extent to
> which the settlement will enable the parties to avoid anticipated
> burdens and expenses in establishing their respective claims and
> defenses; (3) the seriousness of the litigation risks faced by the
> parties; (4) whether the settlement agreement is the product of
> arm's-length bargaining between experienced counsel; and (5) the
> possibility of fraud or collusion.

*Velez v. S.T.A. Parking Corp.*, 23 Civ. 4786 (AT), at *2 (S.D.N.Y. Dec. 14, 2023)

### A.  Settlement Plaintiffs' range of possible recovery weighs in favor of approving the settlement

As set forth above, the instant litigation concerns three claims: (1) late paid overtime under the FLSA; (2) unpaid overtime under the FLSA; and (3) retaliation against Plaintiff Malcolm under the FLSA.

During the course of the parties' negotiations, the DOC produced payroll records which included, *inter alia*, Employee ID Numbers, Earn Dates, Pay Type Codes, Pay Descriptions, Amount Paid, and Pay Date. *See e.g.*, Abelove Dec., Exhibit 8. From that data Plaintiffs were able to determine that there were thousands of hours of late overtime at varying rates from approximately $30 and up. Abelove Dec., p. 10, ¶ 50.   More challenging was unpaid overtime. In the absence of meaningful time and payroll data the Named Plaintiffs were left to analyze their own personal time records and compare same against their pay records to determine their unpaid overtime. Abelove Dec., p. 10-11, ¶ 51. The Named Plaintiffs calculations were then extrapolated out for the Opt-in Plaintiffs and Pertinent Period.   Abelove Dec., p. 10-11, ¶ 51.    Further complicating matters, was that the parties have differences of opinion with respect to: (1) when a payment becomes "late" under the FLSA (the number of days); (2) whether Assistant Deputy Wardens and Captains were eligible for FLSA overtime due to exemptions; (3) the threshold number of hours at which overtime begins to accrue (40 v 43 as the Settlement Plaintiffs are public employees); (4) the impact of certain items like contractual overtime under the pertinent CBAs on

11

the Settlement Plaintiffs' damages; and (5) whether the DOC was entitled to certain offsets for, *inter alia*, compensated meal periods. Abelove Dec., p. 11, ¶ 52.    Considering the foregoing and the time and payroll records the Defendant does have, Plaintiffs estimated total damages of approximately $16,400,000 (consisting of approximately $5,200,000 in unpaid overtime and $11,200,000 in liquidated damages attributable to late paid and unpaid overtime).    Abelove Dec., p. 11, ¶ 53.

According to the DOC, the maximum value of the Settlement Plaintiffs' late paid overtime claim was $300,000 in liquidated damages. Abelove Dec., p. 11, ¶ 54.    Of course, the DOC's official position is that there is no late paid overtime and/or that to the extent there is any late paid overtime any attendant damages would be offset by, *inter alia*, meal credits. Abelove Dec., p. 11, ¶ 54.    As to the unpaid overtime claim, the DOC evaluated same as a maximum of $4,000,000 with corresponding liquidated damages. Abelove Dec., p. 11, ¶ 55.    And, of course, the DOC's official position is that there is no unpaid overtime and/or to the extent that there is any unpaid overtime same would be offset by, *inter alia*, meal credits. Abelove Dec., p. 11, ¶ 55.

Given a range of $0 to $16,400,000, $6,150,000[4] represents approximately 38%[5] of the Plaintiffs' calculated best-case scenario and approximately 74% of the DOC's calculated best-case scenario for Plaintiffs. Abelove Dec., p. 12, ¶ 56.    Such settlement percentages are routinely found to be appropriate. *Khan v. Young Adult Inst., Inc.*, 2018 U.S. Dist. LEXIS 202494, 2018 WL 6250658, at *4-5 (S.D.N.Y. Nov. 29, 2018) (collecting cases of reasonable FLSA settlements

---

[4] The Settlement Sum less $50,000 attributable to Plaintiff Malcolm's emotional distress damages.

[5] Given the extrapolation method for calculating unpaid overtime and the fact that many Named Plaintiffs have higher ranking positions and were thus paid more, it is possible that Plaintiffs' unpaid overtime calculation is high meaning that the 38% estimate is probably low.    Abelove Dec., p. 12, fn 4.

ranging from 25% to 40% of plaintiff's maximum recovery). Notably, the $6,150,000 figure accounts for every dollar of the Settlement Plaintiffs' estimate of unpaid wages as well as a significant portion of the liquidated damages. Abelove Dec., p. 12, ¶ 56.

As to Plaintiff Malcolm, the DOC valued Plaintiff Malcolm's retaliation claim at $10,000 based on records showing that he actually worked more overtime after his transfer than before and that his demotion in title was not inconsistent with disciplinary actions taken for other employees. Abelove Dec., p. 12, ¶ 57. Plaintiffs' counsel was able to obtain $50,000, *to wit*, approximately 100% of the difference between Plaintiff Malcolm's Assistant Deputy Warden salary and overtime earnings and Plaintiff Malcolm's Correction Officer salary and overtime earnings from his demotion until December 2023 and 500% of the DOC's calculation. Abelove Dec., p. 12, ¶ 57. At bottom, the range of recovery factor weighs in favor of approval.

### B. The extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses weighs in favor of approving the settlement

As set forth above, among the items the parties have a disagreement on are: (1) when a payment becomes "late" under the FLSA (the number of days); (2) whether Assistant Deputy Wardens and Captains were eligible for FLSA overtime due to alleged exemptions; (3) the threshold number of hours at which overtime begins to accrue (40 v 43 as the Settlement Plaintiffs are public employees); (4) the impact of certain items like contractual overtime under the pertinent CBAs on the Settlement Plaintiffs' damages; and (5) whether the DOC was entitled to certain offsets for, *inter alia*, compensated meal periods. Each one of the foregoing is a complicated legal and/or factual issue which requires substantial discovery, and which could tip the scales either in whole or part towards Plaintiffs or Defendants.

Moreover, while vital job responsibility and wage information has been exchanged, no depositions have been conducted. Abelove Dec., p. 13, ¶ 60. If the settlement were not to be approved, substantial written discovery including but not limited to written discovery demands, interrogatories and depositions would need to be conducted with respect to, at minimum, the 24 named Plaintiffs and potentially some of the nearly 2,600 opt-ins. Abelove Dec., p. 13, ¶ 61. While discovery of every opt-in would clearly be inappropriate in a collective setting it is possible that the Court could order discovery of at least a cross-section of same. Given the foregoing and the shape of Defendants' records, the parties are easily looking at well over a $1,000,000 in attorney time and expert costs in the absence of a settlement. Abelove Dec., p. 13, ¶ 62. The proposed settlement saves the DOC, which of course is taxpayer funded, substantial discovery costs, saves the parties and counsel for the parties substantial time, and of course alleviates a substantial burden from the Court in having to administer this, in essence, 2,600 plaintiff litigation. Abelove Dec., p. 13, ¶ 62. Additionally, approving the settlement will get money into the hands of the DOC employees who have been patiently waiting for over 3 years. Abelove Dec., p. 13, ¶ 63.

In sum, settlement will undoubtedly enable the parties to avoid substantial burden and expense in establishing their respective claims and defenses.

## C. <u>The seriousness of the litigation risks faced by the parties weighs in favor of approving the settlement</u>

While both sides are confident that they would prevail in a full litigation, each side bears substantial litigation risk. As to the Plaintiffs, their risks include but are not limited to: (1) the Court determining that the Defendant's payment of overtime was not untimely within the meaning of the FLSA; (2) that Assistant Deputy Wardens and Captains are not eligible for FLSA overtime due to exemptions; (3) that the threshold at which overtime begins to accrue is 43 as opposed to

40 hours; (4) not being able to establish the full amount of unpaid overtime (and the attendant liquidated damages) in the absence of time and payroll records concerning same;[6] (5) the Court determining that the DOC's actions were not willful (in light of, *inter alia*, the pandemic) and thus nullifying any liquidated damages; (6) the Court finding that the DOC is entitled to certain offsets like meal breaks; (7) the Court finding that Plaintiff Malcolm was not damaged with respect to his retaliation claim; and (8) the Court decertifying the nearly 2,600 member collective resulting in oppressive, costly, and years' long litigation. Abelove Dec., p. 13-14, ¶ 65.   As to the DOC, their risks include but are not limited to: (1) that Assistant Deputy Wardens and Captains are eligible for FLSA overtime; (2) that the threshold at which overtime begins to accrue is 40 as opposed to 43 hours; (3) the Court determining that the DOC's actions were willful; (4) the Court determining that the DOC's calculations/offsets are understated and/or inappropriate and that the DOC owes more than it is paying in the settlement; (5) that Plaintiffs could be awarded a higher amount of liquidated damages and/or unpaid overtime due to the DOC's absence of records (giving the Plaintiffs a rebuttable presumption regarding their late/unpaid overtime) and the testimony of the opt-in Plaintiffs; (6) the Court finding that Plaintiff Malcolm is entitled to additional damages for, *inter alia*, emotional distress; and (7) the administrative and cost burden of an approximately 2,600 member collective.   Abelove Dec., p. 14, ¶ 66.

If the litigation were not to be settled each side would face substantial litigation risk.

**D. <u>The fact that the settlement agreement is the product of arm's length bargaining between experienced counsel weights in favor of approving the settlement</u>**

---

[6] Settlement Plaintiffs' damages had to be estimated to some extent as the DOC does not have and/or could not produce records pertaining to unpaid overtime.  Instead, Plaintiffs determined collective wide unpaid overtime by reviewing the lead Plaintiffs' own unpaid overtime records and scaling up for collective size and pertinent period of time.

15

The instant settlement is the result of arm's length bargaining between multiple sets of experienced counsel. Initial settlement conversations in this action were conducted by the Law Offices of Jason L. Abelove and the Law Office of Paul A. Pagano, P.C., both attorneys with substantial experience in wage and hour litigation including class and collective actions, on behalf of Plaintiffs and Kami Barker, Esq., a Senior Litigation Counsel for Corporation Counsel with substantial experience in class actions and collective wage & hour claims on behalf of the DOC. Abelove Dec., p. 14-15, ¶ 68. Once Corporation Counsel was substituted, Felice Ekelman, Esq. and Adam Gross, Esq. of Jackson Lewis, one of the pre-eminent employer side law firms in the country, took over representation for the DOC while Mr. Abelove and Mr. Pagano continued to represent Plaintiffs along with the assistance of Mr. Pollack. Abelove Dec., p. 15, ¶ 69. On December 12, 2023, Mr. Abelove and Mr. Pagano on behalf of Plaintiffs and Ms. Ekelman and Mr. Gross on behalf of the DOC engaged in a day-long mediation with the assistance of Darren Rumack, Esq., a Court appointed mediator. Abelove Dec., p. 15, ¶ 70. In addition to being a mediator, Mr. Rumack has his own practice which focuses on representation of employees and employers in all forms of employment law (including FLSA and New York Labor Law wage and hour litigation, workplace discrimination, hostile work environment, harassment, and workers' compensation). Abelove Dec., p. 15, ¶ 70. The instant settlement was the product of several months of negotiation between five attorneys and a mediator/attorney.

The fact that the settlement is the product of arm's length negotiation is a factor which weights in favor of settlement. *Campos v. Goode*, 2011 U.S. Dist. LEXIS 22959, at *16 (S.D.N.Y. Mar. 4, 2011) (FLSA settlement approved after "the parties engaged in mediation with an experienced mediator in an effort to reach a resolution").

### E. The fact that there was no fraud or collusion weights in favor of approval of the settlement

Plainly stated, the proposed settlement is not the product of fraud or collusion. As just mentioned, the settlement is the product of months' long negotiations between five attorneys. Beyond that, Mr. Rumack, a Court appointed mediator with substantial experience in the exact subject of the litigation was instrumental in helping the parties reach a resolution. Yet still, the settlement awards represent figures which, when compared with the potential range of settlement for each claim, demonstrate an absence of fraud or collusion. Finally, the settlement is publicly filed allowing, *inter alia*, the Court to review all its material terms and approve it.

### F. There are no inappropriate provisions in the agreement.

Plaintiffs wish to note that none of the traditionally inappropriate provisions are in the Settlement Agreement. More particularly, there is no general release (only limited releases), there is no confidentiality provision, and there is no non-rehire provision.

### III. Plaintiffs' Counsel's request for attorneys' fees and costs should be granted

### A. Plaintiffs' counsel's request for 1/3 of the settlement sum, which will notably come only from liquidated damages, is supported by the pertinent retainers, opt-in forms and an additional declaration of the Settlement Plaintiffs

Plaintiffs' instant unopposed motion includes a request for costs of $24,500, $22,000 associated with the opt-in notices which were sent to over 12,000 potential opt-ins by a third-party vendor Analytics Consulting LLC and $2,500 for an expert Plaintiffs retained to do settlement calculations. Abelove Dec., Exhibit 6. Plaintiffs' unopposed motion also seeks one-third of the remaining Gross Sum $2,058,500 in attorneys' fees. The Collective Action Settlement Agreement provides for the recovery of costs and expenses as well as 1/3 of the Gross Sum less costs and expenses. Abelove Dec., Exhibit 1, p. 6, § 2.4. The retainer agreement executed by each and every one of the 24 named Plaintiffs provides for the recovery of costs and expenses as well as 1/3

17

of the Gross Sum less costs and expenses. Abelove Dec., Exhibit 7. Moreover, each and every one of the approximately 2,600 opt-in Plaintiffs signed an opt-in form which expressly agrees and acknowledges that Plaintiffs' counsel can recover their costs and expenses as well as 1/3 of the Gross Sum less costs and expenses. Abelove Dec., p. 9-10, ¶ 45. Moreover, submitted herewith are declarations of 16 of the Named Plaintiffs. Abelove Dec., Exhibit 2. Same express their enthusiastic approval of the settlement terms and reconfirm their desire to have Plaintiffs' counsel obtain 1/3 of the Gross Sum, particularly as the Settlement Plaintiffs' own unions wouldn't even represent them. Notably, each and every one of the Named Plaintiffs and Opt-in Plaintiffs was/is a member of a union. Many of them including, most prominently, Plaintiff Malcolm, complained to their union which sat idly by while millions of dollars of overtime was paid late or unpaid. It was not until Plaintiff Malcolm began speaking with Mr. Pagano that anyone considered advocating on behalf of the Settlement Plaintiffs. During the entirety of this over three year and counting litigation, and for all important milestones: (1) obtaining conditional certification; (2) retaining a third party vendor at counsel's cost to send out over 12,000 notices to potential opt-ins; (3) personally cataloguing, redacting, processing and filing almost 2,600 opt-in forms; (4) amending the first amended complaint and overcoming a related motion to dismiss which had the impact of restoring liquidated damages to the litigation and adding an additional year of potential damages;[7] (5) analyzing thousands of lines of payroll data; (6) engaging in settlement negotiations for months on end with two sets of defense counsel; (7) engaging in a successful day long mediation; (8) drafting and executing the settlement agreement; (9) drafting and filing the instant approval motion; and (10) and eventually overseeing implementation of the settlement, the case

---

[7] The Court previously dismissed portions of Plaintiffs' first amended complaint due to a lack of allegations regarding willfulness. *See* Docket Entry 67, p. 5-6.

was prosecuted by Mr. Pagano and/or Mr. Abelove who, for the entirety of the litigation, worked on a contingency fees basis. Not only did counsel undertake such risks but as outlined above, but they obtained substantial results for the Settlement Plaintiffs. Moreover, it is important to note that attorneys' fees will be taken strictly out of liquidated damages (as opposed to back wages). This will ensure that none of the substantial back wages that are to be paid to the Settlement Plaintiffs will be disturbed. Under the foregoing circumstances, Plaintiffs' counsel should receive its contractually agreed upon a 1/3 of the settlement sum (less costs and expenses) as attorneys' fees.

**B. Plaintiffs' counsel's request for 1/3 of the settlement sum is overwhelmingly supported by Second Circuit case law**

"[C]ourts in the Second Circuit routinely award attorney's fees in FLSA settlements of one-third of the total recovery." *Zorn-Hill v A2B Taxi LLC*, 2020 US Dist LEXIS 170608, at *13-14 (SDNY Sep. 17, 2020); *Garcia v Atlantico Bakery Corp.*, 2016 US Dist LEXIS 84631, at *2-4 (SDNY June 29, 2016)("[O]ne-third of the total award is the customary contingency percentage in FLSA cases."). Indeed, 1/3 of a settlement sum is routinely awarded where the recovery is as large or larger than the Settling Plaintiffs will be awarded. *Davis v J.P. Morgan Chase & Co.*, 827 F Supp 2d 172, 178 (WDNY 2011)((awarding one-third of a $42 million settlement in a FLSA and NYLL misclassification case); *Willix v Healthfirst, Inc.*, 2011 US Dist LEXIS 21102, at *15-16 (EDNY Feb. 18, 2011)(awarding class counsel one-third of $7,675,000 settlement fund in FLSA and NYLL wage and hour action."); *Clark v Ecolab Inc.*, 2010 US Dist LEXIS 47036, at *27 (SDNY May 11, 2010)(awarding class counsel 33% of $6 million settlement fund in FLSA and multi-state wage and hour case); *Khait v. Whirlpool Corp.*, No. 06 Civ. 6381, 2010 U.S. Dist. LEXIS 4067, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding class counsel 33% of $9.25 million settlement fund in FLSA and multi-state wage and hour case); *Westerfield v. Wash.*

19

*Mut. Bank*, Nos. 06 Civ. 2817, 08 Civ.0287, 2009 U.S. Dist. LEXIS 94544, 2009 WL 5841129, at *4-5 (E.D.N.Y. Oct. 8, 2009) (awarding 30% of $38 million fund in nationwide overtime suit).

There are several reasons why Courts prefer awarding 1/3 of the settlement fund (as opposed to a lodestar) to compensate attorneys for successful prosecution of statutory claims. First, the percentage method "directly aligns the interests of the class and its counsel" because it provides an incentive to attorneys to resolve the case efficiently and to create the largest common fund out of which payments to the class can be made. *Wal-Mart Stores, Inc. v Visa U.S.A. Inc.*, 396 F3d 96, 122 (2d Cir 2005).

Second, the percentage of the fund method promotes early resolution, and removes the incentive for plaintiffs' lawyers to engage in wasteful litigation in order to increase their billable hours. It "provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores*, 396 F.3d at 121 (internal quotation marks and additional citation omitted). In that regard, the percentage method discourages plaintiffs' lawyers from running up their billable hours, one of the most significant downsides of the lodestar method. *Savoie v. Merchants Bank*, 166 F.3d 456, 460-61 (2d Cir. 1999) ("It has been noted that once the fee is set as a percentage of the fund, the plaintiffs' lawyers have no incentive to run up the number of billable hours for which they would be compensated under the lodestar method."). In the instant litigation, if Plaintiffs' counsel were to act in their own pecuniary interest, they could have easily litigated this case for the next several years driving up their attorneys' fees to 1/3 of the Gross Sum or higher to ensure that they recovered the 1/3 that was agreed to in the governing retainer agreements and opt-in notices. Plaintiffs' counsel should not be punished for instead acting ethically and obtaining an extremely favorable result for their clients at great personal risk. *Hadel et al. v. Gaucho LLC et al.*, No. 15 Civ. 3706 (RLE), hr'g tr. at p. 9-10 (S.D.N.Y. June 30, 2016)

(stating that "I think you should not take the opportunity to penalize people for being efficient."); *Yuzary v HSBC Bank USA, N.A.*, 2013 US Dist LEXIS 144327, at *29 (SDNY Oct. 2, 2013)(stating that counsel should not be penalized "for achieving an early settlement"); *Castagna v Madison Sq. Garden, L.P.*, 2011 US Dist LEXIS 64218, at *30 (SDNY June 7, 2011)(noting that counsel "ultimately negotiated an excellent settlement early in the litigation thus saving hundreds of hours of legal time that would have increased their fees").

Finally, the percentage method preserves judicial resources because it "relieves the court of the cumbersome, enervating, and often surrealistic process of evaluating fee petitions." *Asare v Change Group NY, Inc.*, 2013 US Dist LEXIS 165935, at *45-46 (SDNY Nov. 15, 2013).

## C. The *Goldberger* factors that many Courts look at when determining the reasonableness of an attorney fee award support an award of one-third of the Gross Sum

In determining the reasonableness of fee applications, many courts consider the following six factors set forth by the Second Circuit in *Goldberger*: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. *Goldberger v Integrated Resources*, 209 F3d 43, 50 (2d Cir 2000). Here, all of the *Goldberger* factors weigh in favor of granting approval of Plaintiffs' counsel's fee application.

### 1. Plaintiffs' Counsel's Time And Labor

Among the tasks Plaintiffs' counsel completed for this matter so far were: (1) having discussions with the lead Plaintiffs and drafting the initial complaint; (2) drafting discovery demands and initial disclosures; (3) obtaining conditional certification; (4) retaining a third party vendor at counsel's cost to send out over 12,000 notices to potential opt-ins; (5) personally

cataloguing, redacting, processing and filing almost 2,600 opt-in forms; (6) amending the first amended complaint and overcoming a related motion to dismiss which had the impact of restoring liquidated damages to the litigation and adding an additional year of potential damages; (7) analyzing thousands of lines of payroll data; (8) engaging in settlement negotiations for months on end with two sets of defense counsel; (9) engaging in a successful day long mediation; (10) drafting and executing the settlement agreement; and (11) drafting and filing the instant approval motion. Abelove Dec., p. 16, ¶ 76.   After the Settlement Agreement is approved. Plaintiffs counsel anticipates expending at least another 100 hours to finalize distribution calculations, answer questions from the 2,600 member collective regarding the settlement, and work with Analytics Consulting LLC to administer the settlement including resolving any disputes from Settlement Plaintiffs who challenge their particular allocation. Abelove Dec., p. 17, ¶ 78.  In performing tasks to date, Plaintiffs' counsel expended 713.80 hours and anticipates spending 100 additional hours in administering this Agreement, which is reasonable for a complex case like this one.  Plaintiffs' counsels' 713.80 hours reflects the time spent by Pagano, Abelove, Pollack and the Moser Law firm.  Abelove Dec. p. 17, ¶ 79.  When another 100 hours are added for post-approval work the anticipated total number of hours will be 813.80. *Karic v Major Auto. Cos.*, 2016 US Dist LEXIS 57782, at *27 (EDNY Apr. 27, 2016)(fee award also compensates counsel for time required to administer the settlement sum including answer collective members' questions and working with the claims administrator).  Assuming a $500.00 hourly rate for lodestar purposes, the total fees will be approximately $406,900.00.   The rates used in calculating Plaintiffs' counsel's lodestar are consistent with the rates approved in this District. *Raniere v. Citigroup, Inc.*, 310 F.R.D. 211, 221 (S.D.N.Y. 2015) (applying plaintiffs' counsel's hourly rates of $650-950 per hour for partners,

$350-600 per hour for associates, and $180 per hour for staff and paralegals for purposes of lodestar crosscheck); *Scott v. City of New York*, 643 F.3d 56, 59 (2d Cir. 2011) (holding rate of $550 per hour in FLSA case was reasonable). Here, each of the lead Plaintiffs' counsels (Mr. Pagano, Mr. Pollack, an Mr. Abelove) are Managing Partners of their practices. Mr. Pagano has been practicing for approximately 15 years with a significant portion of that time spent in litigation and wage and hour litigation in particular prosecuting and defending numerous FLSA claims. Pagano Dec., p. 2-4, ¶ 3-9. In addition to the instant litigation, Mr. Pagano prosecuted and eventually settled a hybrid NYLL-FLSA class/collective action case in this District entitled *Connors et al v. American Medical Response, Inc. et al* under docket number 20-cv-05046 and Mr. Pagano, Mr. Abelove, and Mr. Pollack are prosecuting claims on behalf of another collective in *Caccavale et al v. Hewlett-Packard Company a/k/a HP Inc. et al* under docket number 20-cv-00974 in the United States District Court for the Eastern District of New York. Pagano Dec., p.2-3, ¶ 8. Additionally, in January 2022, Mr. Pagano opened his own practice and has been successfully defending and prosecuting numerous wage and hour litigations/arbitrations including those pertaining to violations of the FLSA. Pagano Dec., p. 2, ¶ 5. Mr. Abelove has been practicing law for approximately 30 years with a substantial focus on employment litigation including FLSA claims. Abelove Dec., p. 17, ¶ 80. He has been running his own practice since 1997 Abelove Dec., p. 17 , ¶ 80. Mr. Pollack has been practicing law for approximately 17 years, also in the area of wage and hour litigation with cases concerning the FLSA. Pollack Dec., p. 1, ¶ 2. Mr. Pollack opened his own practice in 2015. *Id.*. Additionally, Plaintiffs' counsel have given presentations/lectures on pressing wage and hour topics. Abelove Dec., p. 21, ¶ 104.

## 2.  The Litigation's Magnitude And Complexity

The size and difficulty of the issues in a case are significant factors to be considered in making a fee award. *Goldberger*, 209 F.3d at 50. Courts have recognized that wage and hour cases involve complex legal issues. *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 743 (1981) ("FLSA claims typically involve complex mixed questions of fact and law.").

The instant matter is of a much larger magnitude and is substantially more complex than a traditional one employee FLSA claim. For one, there are 24 named Plaintiffs and nearly 2,600 opt-in Plaintiffs. Abelove Dec., p. 19, ¶ 88. For another, the Settlement Plaintiffs are spread across various departments at Rikers Island and three job titles (Assistant Deputy Warden, Captain and Correction Officer) which brings into play, *inter alia*, an analysis of whether they are all similarly situated and the potential application of various exemptions from overtime. Abelove Dec., p 19, ¶ 89. Further, the Settlement Plaintiffs are employees of the State of New York which brings in issues of when overtime begins to run (over 40 hours in a week versus over 43 hours in a week). Abelove Dec., p. 19, ¶ 90. Yet still, the Settlement Plaintiffs are unionized bringing in issues of contractual overtime versus FLSA overtime. Abelove Dec., p. 19, ¶ 91. Moreover, the Defendant raised issues of offsets including offset for meal periods which needed to be analyzed. Abelove Dec., p.19, ¶ 92. Beyond that, Defendant produced thousands of lines of data which needed to be analyzed to arrive at appropriate damages figures. Abelove Dec., p. 19, ¶ 93. Also, during the pendency of the litigation the DOC was represented by two separate sets of counsel, one after the other, a fact which had the consequence of lengthening and complicating the litigation and negotiations. Abelove Dec., p. 20, ¶ 94. Last, but not exhaustively, not all of the settlement sum comes from one entity, *to wit*, liquidated damages come from one portion of the City while back

24

wages comes from another; another factor which complicated the negotiations. Abelove Dec., p. 20, ¶ 95.

The foregoing complex and unresolved factual and legal questions demonstrate this is not a relatively straight forward wage and hour case and supports approval of Plaintiffs' counsel's attorneys' fees and costs request. *See Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 479 (2013); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 189 (W.D.N.Y. 2005) (mixed questions of fact and law supported court's award of attorneys' fees representing approximately 40% of the common fund); *Clark v. Ecolab Inc.*, Nos. 07 Civ. 8623, 04 Civ. 4488, 06 Civ. 5672, 2010 WL 1948198, at *4-*8 (S.D.N.Y. May 11, 2010) (approving settlement and award of attorneys' fees representing one-third of the fund in complex wage and hour class and collective action).

### 3. **The Risks Of Litigation**

Plaintiffs' counsel agreed to prosecute this action without any assurance of payment for their services, litigating this case on a wholly contingent basis in the face of significant risk. The retainer agreement signed by the Named Plaintiffs and the opt-in forms reflect the contingency fee arrangement. Abelove Dec., Exhibit 7. Plaintiffs' counsel entered into a contingency fee arrangement knowing that there was a very real possibility of an unsuccessful outcome and, thus, no fee of any kind. *Beckman v KeyBank, N.A.*, 293 FRD 467, 479 (SDNY 2013)("Contingency risk is the principal, though not exclusive, factor courts should consider in their determination of attorneys' fees"). The risk was particularly acute given the numerous factual issues outlined above and that Plaintiffs' counsel was litigating against the City of New York which has unlimited resources. Further, the Law Offices of Jason L. Abelove, the Law Office of Paul A. Pagano, P.C. and the Law Offices of Yale Pollack, P.C. are solo attorney firms meaning that a case of this

magnitude is a primary focus of the practice and there are no other attorneys to work hourly cases to offset the risks of contingency fee work. Abelove Dec., p. 19-20, ¶ 100.

Plaintiffs' counsel stood to gain nothing in the event the case was unsuccessful. However, Plaintiffs' counsel takes on difficult cases like this one because we believe that they are important as many individual workers may be unwilling or unable to front the costs of litigation for an outcome that is uncertain and as the employees' own unions turned them down with nowhere else to turn. In *Hart v RCI Hospitality Holdings*, 2015 US Dist LEXIS 126934, at *42 (SDNY Sep. 22, 2015) in justifying a substantial fee award the Court noted that "the firm retained its obligations to pay salaries and overhead, and assuredly forewent other potential clients and cases. A law firm is a business, too. A substantial fee award is merited here, to recognize the outsize risks that [the firm] took in investing in this uncertain lawsuit." Thus, Plaintiffs' counsel's attorneys' fee request is supported by this factor as well.

### 4. <u>Quality Of The Representation</u>

"To determine the 'quality of the representation,' courts review, among other things, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *Taft v Ackermans*, 2007 US Dist LEXIS 9144, at *31 (SDNY Jan. 31, 2007). Here, the recovery obtained - $6,200,000 - is substantial.

Further, Jason L. Abelove, Esq., Paul A. Pagano and Yale Pollack all have substantial education/background and experience in wage and hour matters. Mr. Abelove is a graduate of Pepperdine University School of Law with approximately 30years of litigation experience the majority of which focuses on wage and hour litigation. Abelove Dec., p.21, ¶103.    Mr. Abelove has run his own practice for the last 27 years. Abelove Dec., p. 21, ¶ 103. Mr. Pagano is a graduate

of Cornell University's School of Industrial and Labor Relations and St. John's University School of Law. Pagano Dec., p. 2, ¶3. Mr. Pagano has almost 15 years' worth of litigation experience with much of it focused on wage and hour litigation both via his time at Certilman Balin Adler & Hyman and in his own practice for the last few years. Pagano Dec., p. 2, ¶ 4-6. Both Mr. Abelove and Mr. Pagano have substantial experience in prosecuting and defending wage and hour class and collective actions obtained via cases such as the instant matter, *Connors* and *Hewlett-Packard Company*. Further, both Mr. Abelove and Mr. Pagano have presented on pressing topics in wage and hour litigation. Finally, the best gauge of the quality of the Plaintiffs' counsels' representation is the full-throated endorsement of the lead Plaintiffs. Abelove Dec., Exhibit 2.

### 5.  The Fee Is Reasonable In Relation To The Settlement

As set forth above Plaintiffs' counsels' request for one-third of the Settlement Sum is reasonable and consistent with the norms of FLSA collective litigation in this circuit. Also as set forth above, Courts in this Circuit have routinely approved requests for one-third of the settlement sum in cases with settlement funds similar or substantially larger than the present action.

Further Plaintiffs' counsels' fees should be calculated as a percentage of the full amount of money that the settlement made available to the collective. In the Second Circuit, "attorneys' fees awarded as a percentage of a common fund must be measured against the entirety of the fund[.]". *Anyoku v World Airways (In re Nig. Charter Flights Litig.*, 2011 US Dist LEXIS 155180, at *18 (EDNY Aug. 25, 2011). Notably, the instant settlement is not a claims made settlement but rather *every single Plaintiff will participate. There is no reversionary amount and attorneys' fees will only come out of liquidated damages leaving back wages untouched.*

Therefore, this factor weighs in favor of granting the requested fees.

27

### 6. **Public Policy Considerations**

Public policy considerations weigh in favor of granting Plaintiffs' counsels' requested fees. In rendering awards of attorneys' fees, "the Second Circuit and courts in this district also have taken into account the social and economic value of [large scale] actions, and the need to encourage experienced and able counsel to undertake such litigation." *In re Sumitomo Copper Litigation*, 74 F. Supp. 2d 393, 399 (1999). "Counsel's fees should reflect the important public policy goal of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest. While court awarded fees must be reasonable, setting fees too low or randomly will create poor incentives to bringing large…cases." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F Supp 3d 344, 352 (SDNY 2014). Here, Plaintiffs' counsel successfully negotiated a settlement that obtained significant monetary compensation for the Settlement Plaintiffs *when their own unions refused to help them*. Abelove Dec., Exhibit 2. Plaintiffs' counsel should not be disincentivized from helping others by having their agreed upon fee reduced.

### D. **The Lodestar, Which Is Only To Be Used As a Loose Cross-Check At Most, Further Supports An Award To Class Counsel Of One-Third Of The Settlement Fund.**

In *Almanzar v Silver Star Props. Corp.*, 2023 US Dist LEXIS 190516 (SDNY Oct. 24, 2023), a recent FLSA case decided by Judge Gorstein in this District, the Court made several compelling arguments as to why counsel in contingency fee cases should receive their contractual 1/3 of the settlement sum irrespective of their lodestar.

In granting Plaintiffs' counsel 1/3 of the settlement sum the Court noted

> [T]he plaintiff and the attorney agreed in advance that the attorney would be entitled to one-third of the settlement as attorney's fees. The very purpose of a contractual contingency fee arrangement is to ensure recovery for an attorney <u>regardless of the number of hours actually expended by the attorney</u>. In other words, attorneys who take on FLSA

28

cases on contingency bear the risk of having to litigate cases in which the recovery may not adequately compensate them for the time expended. See generally King v. Fox, 2004 U.S. Dist. LEXIS 462, 2004 WL 68397, at *5 (S.D.N.Y. Jan. 14, 2004) ("Contingency fees account for the risk taken in representing a client."). Therefore, in cases where attorneys spend fewer hours than would be expected to match the amount in the contingency arrangement, it is only proper that they be permitted to collect their contracted fee given the risk they have assumed. "[A] contingency fee arrangement provides an incentive to counsel to take on cases that are less than sure winners." Blizzard v. Astrue, 496 F. Supp. 2d 320, 325 (S.D.N.Y. 2007). <u>Finding such contingency fee arrangements not "reasonable" under Cheeks whenever the attorneys achieve a significant benefit from the contingency arrangement will only serve to diminish the pool of attorneys willing to accept the risks in FLSA cases. This runs counter to one of the purposes of the FLSA — to provide an avenue for workers deprived of their just wages to seek redress in the courts — and is therefore rejected.</u>

*Almanzar v Silver Star Props. Corp.*, 2023 US Dist LEXIS 190516, at *6-8 (SDNY Oct. 24, 2023)(emphasis added). Further, the Court declined to perform a lode-star cross check "because it would have no bearing on our assessment of the reasonableness of the fee sought if it turned out that the 'lodestar' for counsel's hours (that is, a reasonable hourly rate multiplied by the reasonable number of hours expended) is far less than the one-third contingency payment." *Almanzar v Silver Star Props. Corp.*, 2023 US Dist LEXIS 190516, at *5 (SDNY Oct. 24, 2023).

Even if the Court is inclined to do a cross-check, it must be noted that "[f]ollowing *Goldberger*, the trend in the Second Circuit has been to apply the percentage method and loosely use the lodestar method as a 'baseline' or as a 'cross check.'" *Tiro*, 2013 US Dist LEXIS 129258, at *46 (SDNY Sep. 10, 2013). Meaning that while Courts still use the lodestar method as a "cross check" when applying the percentage of the fund method, courts are not required to scrutinize the fee records as rigorously. *Goldberger*, 209 F.3d at 50. Courts additionally note that lodestars should not be used to penalize attorneys for obtaining an early resolution of a case. In *Beckman v*

29

*KeyBank, N.A.*, 293 FRD 467, 482 (SDNY 2013), the court, in granting plaintiffs' counsel their requested 1/3 of the settlement sum, noted that the fact that the fee award was about 6.3 times the lodestar "should not result in penalizing plaintiffs' counsel for achieving an early settlement, particular[ly] where, as here, the settlement amount is substantial." This sentiment was echoed by Judge Ellis, when considering a substantial settlement where the fee award was about 5 times the lodestar:

> "[T]he proportion of the lodestar is probably higher if you're able to effectuate a settlement earlier and certainly that's to be encouraged, you could have litigated longer and [t]he proportion would have been less but that would not be a good result for either the plaintiffs, the defendants, either counsel or the class members. So I think you should not take the opportunity to penalize people for being efficient."

*Hadel et al. v. Gaucho LLC et al.*, No. 15 Civ. 3706 (RLE), hr'g tr. at p. 9-10 (S.D.N.Y. June 30, 2016) (awarding 1/3 of $2,375,000 settlement).

Here, Plaintiffs' counsel's lodestar to present is $ 356,900.00 at set forth more fully in the accompanying declarations of Pagano, Abelove, and Pollack. Additionally, Plaintiffs' counsel will be required to spend significant additional time on the litigation in connection with implementing and monitoring the settlement. All in Plaintiffs' counsel anticipates the lodestar to be $406,900.00. Once the lodestar is determined courts then consider whether a multiplier is warranted based on factors such as: "(1) the contingent nature of the expected compensation for services rendered; (2) the consequent risk of non-payment viewed as of the time of filing the suit; (3) the quality of representation; and (4) the results achieved. *Sewell v Bovis Lend Lease LMB, Inc.*, 2012 US Dist LEXIS 53556, at *37-38 (SDNY Apr. 16, 2012). All of these factors weigh in favor of granting Plaintiffs' counsels' fee request.

First, is it undisputed that the case was prosecuted on a straight contingency fee basis with Plaintiffs' counsel laying out all out-of-pocket expenses. Second, there was a substantial risk of non-payment or, at minimum, several years' worth of non-payment given, *inter alia*, the numerous hotly contested factual issues in the case and the fact that the defendant is the City of New York which has unlimited resources and, present matter notwithstanding, a tendency towards protracted litigation. Third, the quality of representation and results achieved go hand-in-hand and are both high. As set forth in the accompany declarations of Plaintiffs' counsel same have substantial education and experience in the wage and hour field including with respect to class and collective actions. Plaintiffs' counsel was able to overcome a motion to dismiss, obtain conditional certification (over the DOC's objections), oversee the opt-in notice process including the redaction and processing of approximately 2,600 forms, review and analyze voluminous payroll records, engage in months' long negotiations with two sets of counsel while analyzing a myriad of complex legal issues, and finally arrive at a very favorable settlement for the Settlement Plaintiffs many of whom expressed their gratitude via declarations.

In light of the foregoing factors, Plaintiffs' counsels' request for one-third of the Gross Sum (approximately 5 times their lodestar) is reasonable and well within the multiplier range awarded by courts in the Second Circuit and this District. *Yuzary*, 2013 US Dist LEXIS 144327, at *29-30 (granting multiplier of 7.6 and stating that counsel should not be penalized "for achieving an early settlement"); *Beckman v KeyBank, N.A.*, 293 FRD 467, 482 (SDNY 2013)(granting 6.3 multiplier); *Zeltser v Merrill Lynch & Co.*, 2014 US Dist LEXIS 135635, at *22 (SDNY Sep. 23, 2014)(granting multiplier of 5.1).

Plaintiffs' counsel is aware of the existence of *Fujiwara v. Sushi Yasuda LTD. et al.*, 58 F. Supp. 3d 424 (S.D.N.Y. 2014) in which the Court permitted between a 1.75 and 2.28 multiplier.

31

*Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 439 (S.D.N.Y. 2014). Such case is *inapposite*. For one, this case is substantially larger in scope than in *Fujiwara*. As stated above, this case involves 24 named Plaintiffs and almost 2,600 opt in Plaintiffs while *Fujiwara* involved 3 named plaintiffs and a theoretical class and collective. For another, this case involves numerous issues that were not present in *Fujiwara* including, but not limited to: (1) plaintiffs spread across various departments at Rikers Island (as opposed to one restaurant location in *Fujiwara*) and three job titles (Assistant Deputy Warden, Captain and Correction Officer) which bring into play whether those employed in the various locations/job titles are similarly situated to each other and the analysis and application of various exemptions from overtime (as opposed to one location/job title in *Fujiwara*-waitress-which did not implicate exemptions); (2) the fact that Settlement Plaintiffs are employees of the State of New York which brings in issues of when overtime begins to run, namely over 40 hours in a week versus over 43 hours in a week (*Fujiwara* involved private employees whose overtime unquestionably begins after 40 hours); (3) the fact that Settlement Plaintiffs are unionized bringing in issues of contractual overtime versus FLSA overtime (the employees in *Fujiwara* were not unionized); (4) the fact that the DOC was represented by two separate sets of defense counsel, one of which replaced the other, a fact which had the consequence of lengthening and complicating the litigation (*Fujiwara* appeared to be represented by several firms but all at the same time); and (5) the fact that the settlement fund does not come from one entity, *to wit*, liquidated damages come from one portion of the City while back wages comes from another; another factor which complicated the negotiations. Yet still, Plaintiffs' counsel has done substantially more work in this matter than the plaintiffs' counsel in *Fujiwara*. Among other things, in this case Plaintiffs opposed two motions to dismiss and obtained conditional certification, none of which happened in *Fujiwara*. Finally, but not exhaustively, all of the

attorneys' fees in this matter would come from liquidated damages meaning that the Settlement Plaintiffs' back wages would be undisturbed. That does not appear to have been the case in *Fujiwara*. In closing on this point, it is worth nothing that cases after *Fujiwara*, decided in November 2014, continue to apply multipliers higher than 2.28 and/or award 1/3 of the settlement sum. In *Ramos v DNC Food Serv. Corp.*, 2022 US Dist LEXIS 35181, at *6 (SDNY Feb. 25, 2022) the Court cited with approval a court that awarded 6.3 times the lodestar and stated that "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar." In *Sykes v Mel Harris & Assoc., LLC*, 2016 US Dist LEXIS 74566, at *48 (SDNY May 24, 2016) Judge Chin cited appropriate multipliers of 4.5, 5.3, and provided that "[in] contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *Braunstein v. Hudson Hall*, 19-cv-7983 (SDNY May 2021)(awarding 6.17 multiplier); *Meza v 317 Amsterdam Corp.*, 2015 US Dist LEXIS 166890, at *5 (SDNY Dec. 14, 2015)(awarding 1/3 of settlement sum without lodestar analysis); *Solis v Orthonet LLC*, 2021 US Dist LEXIS 122512, at *10 (SDNY June 30, 2021)("Typically, courts use multipliers of 2 to 6 times the lodestar."); *Puglisi v. TD Bank, N.A.*, No. 14 Civ. 02740 (AT) (GWG), hr'g tr. at p. 10-12 (E.D.N.Y. July 30, 2015) (awarding multiplier of 4.8 and distinguishing case and counsel from *Fujiwara*); *Hadel*, 2016 WL 3647600, at *1 (granting multiplier of 5); *Pena v. LeCirque, Inc.*, 14 Civ. 7541 (FM), hr'g tr. at pg. 7-8 (S.D.N.Y. Jan. 21, 2016) (granting 4.9 multiplier); *Velez v S.T.A. Parking Corp.*, 2024 US Dist LEXIS 24280, at *9, n 2 (SDNY Feb. 12, 2024)(granting lodestar multiplier of 6.6 and noting that courts "regularly award lodestar multipliers of up to eight times the lodestar.")

At bottom, Plaintiffs' counsel's request for attorneys' fees is reasonable.

### E. **Plaintiffs' counsel is entitled to reimbursement for litigation expenses**

Plaintiffs' counsel seeks reimbursement of $24,500 in necessary litigation costs and expenses ($22,000 to third party claims administrator Analytics Consulting, LLC in connection with prior notice to the collective and $2,400 in connection with an expert retained to do settlement calculations). "Courts typically allow counsel to recover their reasonable out-of-pocket expenses." *Sukhnandan,,* 2014 US Dist LEXIS 105596, at *43. Given that Plaintiffs' counsel's unreimbursed expenses were incidental and necessary to effectuate collective action notice, they should be approved. Abelove Dec., Exhibit 6. Particularly, as the governing retainer and opt-in forms permit same.

### IV. **The Settlement Administrator should be approved**

The Parties retained Analytics Consulting LLC, an experienced wage and hour claims administrator, to serve as the Settlement Administrator.   The Settlement Administrator's fees are estimated to be no greater than $30,000 which will be paid from the Gross Fund.  Abelove Dec., Exhibit 5.  Settlement Administrator fees in this amount (and higher) are routinely found to be reasonable, given the work necessary to administer the Settlement.

### CONCLUSION

Simply put, the Settlement Plaintiffs stand to receive a very significant settlement of $6,200,000 which gives them, according to the DOC's best-case calculations for Plaintiffs, 100% of their liquidated damages for late pay, 73% of their unpaid overtime damages and attendant liquidated damages, and 500% of Plaintiff Malcolm's retaliation claim.   The settlement should be approved and Plaintiffs' counsel should be awarded 1/3 of the Gross Sum

consistent with the governing retainer agreement, opt-in forms, case law and full throated support of the Settlement Plaintiffs.


Dated: July 15, 2024
       Garden City, New York

                                        Law Offices of Jason L, Abelove, P.C.


                                        By: _____
                                        Jason L. Abelove, Esq.
                                        *Attorneys for Plaintiffs*
                                        666 Old Country Road, Suite 303
                                        Garden City, NY 11530
                                        (516) 222-7000