UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
OMAR MALCOLM, KARVEN ALCINDOR,
ANTHONY APONTE, SHIRLENE BLAIR, DERYCK
CHARLES, LATIF CORNELIUS, LANAE CURRY,
JOSE DEJESUS, SHAKIYNA ESPINO, ROBERTO
FERNANDEZ, VLAJEMY FRANCOIS, CRYSTAL
GARNETT, CHANTEL GOUVEIA, APRIL HERNEY-
KOSAKOWSKI, TAMELLE HILLIARD, YOLANDA
HOLMES, MONIQUE JOHNSON, KEYSHA LEWIS,
CAROLYN MARAJ, HUZIRAN MOZEB, ZHIHUI PU,
DAVID RUDDOCK, MYRLINE ULYSSES, and BRICE
WILLIAMS, individually and on behalf of all others
similarly situated,

           Plaintiffs,

    - against -

THE CITY OF NEW YORK,

           Defendant.
--------------------------------------------------------------------x

Case No. 20-CV-09641(ALC)

**ABELOVE DECLARATION
IN SUPPORT OF
UNOPPPOSED APPROVAL
MOTION**

**Hon. Andrew L. Carter, Jr.**

   JASON ABELOVE, an attorney duly admitted to practice in the Courts of this State and

this Court, hereby affirms the following upon information and belief and under penalty of

perjury:

   1.  Paul Pagano, Yale Pollack and I are the lawyers primarily responsible for

prosecuting  Plaintiffs Omar Malcolm, Karven Alcindor, Anthony Aponte, Shirlene Blair,

Deryck Charles, Latif Cornelius, Lanae Curry, Jose DeJesus, Shakiyna Espino, Roberto

Fernandez, Vlajemy Francois, Crystal Garnett, Chantel Gouveia, April Herney-Kosakowski,

Tamelle Hilliard, Yolanda Holmes, Monique Johnson, Keysha Lewis, Carolyn Maraj, Huziran

Mozeb, Zhihui Pu, David Ruddock, Myrline Ulysses, and Brice Williams' (collectively the

"Named Plaintiffs") and the nearly 2,600 opt-in plaintiffs ("Opt-in Plaintiffs" and with the

Named Plaintiffs, "Settlement Plaintiffs") claims against the City of New York ("Defendant")

for violation of the Fair Labor Standards Act in failing to pay overtime and failing to pay overtime timely.

2.      The instant declaration is being submitted in support of the Settlement Plaintiffs' instant unopposed motion for approval of the settlement agreement between the Settlement Plaintiffs and the Defendant.

3.      The proposed settlement agreement is attached hereto as Exhibit 1.

## PERTINENT FACTUAL ALLEGATIONS

4.      The Settlement Plaintiffs were/are employed by the Department of Corrections ("DOC") from November 17, 2017 to December 14, 2023 in the titles of Assistant Deputy Warden, Captain, or Correction Officer and stationed at Riker's Island.  *See* e.g., Docket Entry ("D.E.") 46 (2), p. 1, ¶ 2.

5.      Settlement Plaintiffs kept track of their time via timesheets.  D.E. 46 (2), p. 2, ¶ 8, 9.

6.      They often worked/work in excess of 40 hours a week.  D.E. 46 (2), p. 2, ¶ 9.

7.      At the end of each daily tour, they submitted tour certification sheets that listed*, inter alia,* all of the overtime they work.  D.E. 46 (2), p. 2, ¶ 9.

8.      Their time sheets/tour certification sheets were given to a timekeeper who put the information into a program called CityTime.  D.E. 46 (2), p. 2, ¶ 9, 10.

9.      The timesheets/tour certification sheets were submitted to the DOC on a daily basis. D.E. 46 (2), p. 2, ¶ 9, 10.

10.      While the Named Plaintiffs alleged that the DOC can pay overtime compensation earned in a particular workweek on the regular payday for the period in which such workweek ends, the DOC does not do so.  D.E. 46 (2), p. 2-3, ¶ 12.

11.     Instead, the DOC built in a lag with respect to the second week of overtime for each bi-weekly pay period.  By way of example, on January 3, 2014, the DOC paid the regular wages earned during December 15, 2013 to December 28, 2013 and the overtime wages earned during December 8, 2013 to December 21, 2013.  Overtime earned during the week of December 22-28 was paid in the subsequent paycheck on January 17, 2014 and the Named Plaintiffs alleged same is untimely pursuant to the FLSA and 29 C.F.R. § 778.106 which require that the overtime wages earned in a given period be paid in the same paycheck as the regular wages earned for that period.  D.E. 46 (2), p. 2-3, ¶ 12.

12.     In addition, the Named Plaintiffs alleged that there are substantial overtime wages which are paid later than the one paycheck lag the DOC builds in.  Using the above example, the overtime wages for the week of December 22nd, which were supposed to be paid on January 17, 2014 according to the DOC, are frequently paid much later.  D.E. 46 (2), p. 3-4, ¶ 13-16.

13.     Further, the Named Plaintiffs alleged that there are millions of dollars of late paid and unpaid overtime.  D.E. 46 (2), p. 3-4, ¶ 13-16.

14.     In addition to the foregoing, Named Plaintiff Omar Malcolm ("Malcolm") alleged that he was discriminated against in violation of the FLSA due to, *inter alia*, his complaints about the DOC's failure to pay him overtime timely or indeed at all.  D.E. 46.

## PERTINENT PROCEDURAL HISTORY

15.     On November 17, 2020, a subset of the current Named Plaintiffs filed their initial complaint in this action alleging: (1) late paid overtime under the FLSA; (2) unpaid overtime under the FLSA; and (3) retaliation against Plaintiff Malcolm in violation of the FLSA.  D. E. 1.

16.     On February 22, 2021, the Named Plaintiffs filed an amended complaint which included all 24 of the Plaintiffs.  D.E.  26.

17.     On April 13, 2021, the DOC filed a motion to dismiss the first amended complaint.  D.E. 31, 32.  Plaintiffs opposed same on May 5, 2021.  D.E. 33.  On May 19, 2021, the DOC filed its reply.  D.E. 37.

18.     On or about August 23, 2021, Plaintiffs filed a motion seeking conditional collective certification.  D.E. 46, 47, 48.  On November 18, 2021, the DOC filed its opposition to the conditional collective certification motion.  D.E. 56.  Plaintiffs filed their reply on February 21, 2022.  D.E. 65.

19.     On March 8, 2022, the Court granted in part and denied in part the DOC's motion to dismiss the first amended complaint.  D.E. 67.  On April 5, 2022, Plaintiffs filed a motion seeking to amend their complaint and reconsideration of the Court's March 8, 2022 Opinion and Order.  D.E. 80,81.  On April 12, 2022, the DOC filed its opposition papers.  D.E. 82.  On April 19, 2022, Plaintiffs filed their reply.  D.E. 83.

20.     On September 30, 2022, the Court conditionally certified a collective holding, in part, that the Plaintiffs are similarly situated.  D.E. 87.  The following collective was certified "All Assistant Deputy Wardens, Captains, and Correction Officers employed by the City of New York ("NYC")/Department of Corrections ("DOC") at Rikers Island at any time from November 17, 2017 to the time certification was granted."  D.E. 47, p. 2; 87.  Notably, that is virtually the same as the proposed settlement collective with the only difference being an end date of December 14, 2023 (the date of settlement).

21.     On October 12, 2022, the Court denied Plaintiffs' motion for reconsideration but granted Plaintiffs' motion to amend their complaint.  D.E. 89.  On October 21, 2022, the DOC

moved to dismiss Plaintiffs' second amended complaint.  D.E. 91, 92.  The Plaintiffs opposed on November 14, 2022.

22.     Also on or about November 14, 2022, notice was sent to thousands of potential collective members at significant expense to Plaintiffs' counsel via third-party administrator Analytics Consulting LLC.

23.     From November 14, 2022 through March 17, 2023, Plaintiffs' counsel, processed, redacted, catalogued and filed almost 2,600 opt-in forms.  D.E. 96-132, 136.

24.     Said process included negotiating with Corporation Counsel (the DOC's prior attorney before Jackson Lewis) to permit late opt-ins (a negotiation which permitted dozens of additional opt-ins to participate in the litigation and ultimately this settlement).

25.     On June 30, 2023, the Court denied the DOC's motion to dismiss Plaintiffs' second amended complaint.  D.E. 138.  Plaintiffs' second amended complaint was filed on July 28, 2023, followed shortly thereafter by the DOC's answer.  D.E. 139, 140.

26.     On August 4, 2023, the matter was referred to mediation.  D.E. 141.

27.     In or about early August 2023, Jackson Lewis substituted in as counsel for the DOC.

<u>**DISCOVERY**</u>

28.     Though the Parties did not engage in depositions, they did engage in written discovery in this case including the exchange of documentation necessary to the resolution of this case.

29.     More particularly, the DOC provided Plaintiffs' counsel with, *inter alia*, excel spreadsheets containing the overtime paid to the Named Plaintiffs and Opt-in Plaintiffs.

30.     Said records were voluminous containing thousands of lines of code and requiring hours and hours of analysis all of which were done by Plaintiffs' counsel.

31.     Such analysis allowed Plaintiffs to arrive at figures for late paid overtime.

32.     The DOC also provided Plaintiffs' counsel with collective bargaining agreements which, *inter alia*, allowed the parties to determine if the Plaintiffs and Opt-in Plaintiffs were similarly situated across job titles.

## NEGOTIATIONS

33.     Negotiations in this matter were arduous, took several months, and spread across two sets of defense counsel.

34.     On or about April 27, 2023, after the DOC's extensive payroll data was analyzed, Plaintiffs' counsel sent Corporation Counsel a demand letter setting forth their initial demand.

35.     Thereafter, Plaintiffs' counsel and Corporation Counsel exchanged several emails and had several calls during which the DOC gave its positions on why Plaintiffs' damages figures were incorrect which included that Assistant Deputy Wardens and Captains were included in the analysis (who the DOC believes are exempt from the FLSA), that certain overtime in the data was contractual rather than FLSA overtime, that certain cash premiums in the data were not FLSA overtime, and that certain companion codes in the data were not FLSA overtime.

36.     Thereafter, on June 8, 2023, Plaintiffs' counsel sent a revised settlement demand incorporating, for settlement purposes only, the DOC's positions.

37.     In or about August 2023, Jackson Lewis was substituted in as counsel for the DOC and raised additional issues concerning offsets to the Named Plaintiffs and Opt-In Plaintiffs' late/unpaid overtime claims.

38.     On December 12, 2023, the parties held a full day long mediation with Court appointed mediator Darren Rumack, Esq. who was able get the parties to resolve the matter for $6,200,000 consisting of $3,000,000 in back pay damages, $3,150,000 in liquidated damages, and $50,000 in damages for Plaintiff Malcolm's retaliation claim.

39.     Plaintiffs and their counsel believe this represents a strong resolution to this over three-and-a-half-year long litigation.  As evidence of that fact, attached collectively hereto as Exhibit 2 are 16 declarations from Named Plaintiffs expressing their overwhelming support for the settlement agreement particularly in light of the fact that their unions utterly failed to assist them in obtaining their late paid and unpaid overtime.

## <u>KEY SETTLEMENT TERMS</u>

40.      <u>Gross Sum-</u> The settlement agreement establishes a Gross Settlement Sum of $6,200,000 to settle claims against Defendant (the "Gross Sum") which covers  the Settlement Plaintiffs' settlement awards, Plaintiffs' counsel's attorneys' fees and costs, Plaintiff Malcolm's retaliation damages, and the fees and costs of the Settlement Administrator.

41.     <u>Settlement Collective</u>-The settlement collective will be "all current or former Assistant Deputy Wardens, Captains, and Correction Officers employed by the City of New York/Department of Corrections at Rikers Island at any point from November 17, 2020 to December 14, 2023."  The Settlement Plaintiffs are all members of that collective and will all receive payments from the settlement sum. *See e.g.*, D.E. 96-132, 135.

42.     <u>Notice Process</u>-  Within 21 days from the later of the date that the Court enters an order finally approving the settlement agreement or the resolution of any appeal therefrom, Defendant is going to provide Plaintiffs' Counsel and Analytics Consulting LLC, the retained third-party administrator, with the social security numbers and last known addresses of all

Settlement Plaintiffs.  Within 30 days thereafter the proposed notice (attached hereto as Exhibit 3) will go out to the Settlement Plaintiffs formally advising them of the settlement of the action and the manner in which they will be paid.  Notably, each and every Named Plaintiff has submitted a written authorization permitting Plaintiffs' counsel to "pursue any claims I may have, including such litigation as may be necessary, and I hereby consent, agree, and option to become a plaintiff herein and to be bound by any settlement of this action or adjudication by the Court."  *See e.g.*, D.E. 9.  Likewise, each and every Opt-in Plaintiff has submitted a written authorization in which they explicitly provided that "I hereby further authorize and designate the named plaintiffs to act on my behalf concerning the litigation. I agree to be bound by any adjudication of this action by a court, whether it is favorable or unfavorable. I further agree to be bound by any settlement of this action."  *See e.g.*, D.E. 96, p. 1.[1]

43.    <u>Settlement Awards</u>- For each individual Settlement Plaintiff their total number of overtime hours worked during the period of November 17, 2017 to December 14, 2023 ("Pertinent Period") will be divided by the total number of overtime hours worked by all Settlement Plaintiffs during the Pertinent Period to arrive at a percentage.[2]   That percentage will be multiplied first by $3,000,000 to determine each Settlement Plaintiff's gross backpay award and second by $3,150,000 less attorneys' fees and costs (including administrative costs) to arrive at a liquidated damages award.  Each Settlement Plaintiff who has a backpay award

---

[1] Plaintiffs' counsel also wishes to note that an email was sent to all Settlement Plaintiffs for whom we have an email address and advised them of the key settlement terms.  A true and correct copy of the email is attached hereto as Exhibit 4.  The response to same has been overwhelmingly positive.

[2] The Named Plaintiffs, who have spent 3 years assisting in the litigation of this case by providing information for the complaint, providing documentation and providing information regarding the DOC's alleged defenses, will have their numerator multiplied by 3.

above $75 and a liquidated damages award above $25 will have said awards reduced ratably so that each Settlement Plaintiff who would not otherwise receive $75 in back pay and $25 in liquidated damages is awarded same.  The amount of each Settlement Plaintiff's share of the settlement sum will be disclosed to the Settlement Plaintiff in the Notice Packet.

44.     <u>Claims Administration-</u>  Plaintiffs have retained Analytics Consulting LLC, an experienced wage and hour claims administrator, to serve as the settlement administrator.  The settlement administrator's fees are expected to be $30,000, will be paid from the Gross Sum.  A true and correct copy of Analytics Consulting, LLC's estimate is attached hereto as Exhibit 5. The fees will cover, among other things, preparing the notice, making payments due to Settlement Plaintiffs, updating addresses for Settlement Plaintiffs, distributing Court-approved attorneys' fees and costs to Plaintiffs' counsel, providing tax forms as required under the settlement agreement and applicable law, establishing, controlling, and maintaining the Qualified Settlement Fund (QSF), and filing all required tax returns for the QSF and paying all taxes due.

45.     <u>Attorneys' Fees and Costs-</u> under the settlement agreement, Plaintiffs' Counsel requests the return of their costs: (1) $22,000 in administrative costs associated with disseminating the original opt-in notices to over 12,000 potential members via third-party vendor Analytics Consulting, LLC and (2) $2,500 in fees to Plaintiffs' expert for calculations in connection with the settlement.  Attached collectively hereto as Exhibit 6 are true and correct copies of estimates/invoices for the aforesaid $24,500.  Also pursuant to the settlement agreement, Plaintiffs' counsel seeks 1/3 of the Gross Sum, less attorneys' fees and costs, in the amount of $2,058,500 as attorneys' fees.  Attached hereto as Exhibit 7 is a true and correct copy of the subject retainer agreement.  The retainer agreement provides for the collection of

expended fees and costs as well as 1/3 of the balance as attorneys' fees.  Likewise, each and every Opt-in Plaintiff's consent to join form provides for the recovery of expended fees and costs as well as 1/3 of the balance as attorneys' fees.  *See e.g.*, D.E. 96.

## FAIRNESS FACTORS

46.    The factors Courts analyze in determining whether to approve a settlement under the FLSA are:  (1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion.

47.    <u>Range of Settlement-</u> The three claims in this litigation are: (1) late paid overtime under the FLSA; (2) unpaid overtime under the FLSA; and (3) retaliation against Plaintiff Malcolm under the FLSA.

48.    During the parties' negotiations, the DOC produced payroll records which included, *inter alia*, Employee ID Numbers, Earn Dates, Pay Type Codes, Pay Descriptions, Amount Paid, and Pay Date.  A sample of that data is attached hereto as Exhibit 8.

49.    Based on the date overtime was earned and the date it was ultimately paid, Plaintiffs were able to determine the amount of late paid overtime.

50.    More particularly, from that data Plaintiffs were able to determine that there were thousands of hours of late overtime at varying rates from approximately $30 and up an hour.

51.    More challenging was unpaid overtime.  In the absence of meaningful time and payroll data the Named Plaintiffs were left to analyze their own personal time records and

compare same against their pay records to determine their unpaid overtime.  The Named

Plaintiffs' calculations were then extrapolated out for the Opt-in Plaintiffs and Pertinent Period.

52.    Further complicating matters, was that the parties have differences of opinion

with respect to: (1) when a payment becomes "late" under the FLSA (the number of days); (2)

whether Assistant Deputy Wardens and Captains were eligible for FLSA overtime due to

exemptions; (3) the threshold number of hours at which overtime begins to accrue (40 v 43 as

the Settlement Plaintiffs are public employees); (4) the impact of certain items like contractual

overtime under the pertinent CBAs on the Settlement Plaintiffs' damages; and (5) whether the

DOC was entitled to certain offsets for, *inter alia*, compensated meal periods.

53.    Taking into account the foregoing and the time and payroll records the Defendant

does have, Plaintiffs estimated total damages of approximately $16,400,000 (consisting of

approximately $5,200,000 in unpaid overtime and $11,200,000 in liquidated damages

attributable to late paid and unpaid overtime).

54.    According to the DOC, the maximum value of the Settlement Plaintiffs' late paid

overtime claim was $300,000 in liquidated damages.  The DOC's official position is that there

is no late paid overtime and/or that to the extent there is any late paid overtime any attendant

damages would be offset by, *inter alia*, meal credits.

55.    As to the unpaid overtime claim, the DOC evaluated same as a maximum of

$4,000,000 with corresponding liquidated damages.  The DOC's official position is that there is

no unpaid overtime and/or to the extent that there is any unpaid overtime same would be offset

by, *inter alia*, meal credits.

56.     Given a range of $0 to $16,400,000, $6,150,000[3] represents approximately 38%[4] of the Plaintiffs' calculated best-case scenario and approximately 74% of the DOC's calculated best-case scenario for Plaintiffs.  Notably, the $6,150,000 figure accounts for every dollar of the Settlement Plaintiffs' estimate of unpaid wages as well as a significant portion of the liquidated damages.

57.     As to Plaintiff Malcolm, the DOC valued Plaintiff Malcolm's retaliation claim at $10,000 based on records showing that he actually worked more overtime after his transfer than before and that his demotion in title was not inconsistent with disciplinary actions taken for other employees.  Plaintiffs' counsel was able to obtain $50,000, *to wit*, approximately 100% of the difference between Plaintiff Malcolm's Assistant Deputy Warden salary and overtime earnings and Plaintiff Malcolm's Correction Officer salary and overtime earnings from his demotion until December 2023 and 500% of the DOC's calculation.

58.     Avoiding anticipated burdens and expenses- Among the items the parties have a disagreement on are: (1) when a payment becomes "late" under the FLSA (the number of days); (2) whether Assistant Deputy Wardens and Captains were eligible for FLSA overtime due to alleged exemptions; (3) the threshold number of hours at which overtime begins to accrue (40 v 43 as the Settlement Plaintiffs are public employees); (4) the impact of certain items like contractual overtime under the pertinent CBAs on the Settlement Plaintiffs' damages; and (5) whether the DOC was entitled to certain offsets for, *inter alia*, compensated meal periods.

---

[3] The Gross Sum less $50,000 attributable to Plaintiff Malcolm's emotional distress damages.

[4] Given the extrapolation method for calculating unpaid overtime and the fact that many Named Plaintiffs have higher ranking positions and were thus paid more, it is possible that Plaintiffs' unpaid overtime calculation is high meaning that the 38% estimate is probably low.

59.    Each one of the foregoing is a complicated legal and/or factual issue which requires substantial discovery, and which could tip the scales either in whole or part towards Plaintiffs or Defendants.

60.    Moreover, while vital job responsibility and wage information has been exchanged, no depositions have been conducted.

61.    If the settlement were not to be approved, substantial written discovery including but not limited to written discovery demands, interrogatories and depositions would need to be conducted with respect to, at minimum, the 24 named Plaintiffs and potentially some of the nearly 2,600 opt-ins.  While discovery of every opt-in would clearly be inappropriate in a collective setting it is possible that the Court could order discovery of at least a cross-section of same.

62.     Given the foregoing and the shape of Defendant's records, the parties are easily looking at well over a $1,000,000 in attorney time and expert costs in the absence of a settlement.  The proposed settlement saves the DOC, which of course is taxpayer funded, substantial discovery costs, saves the parties and counsel for the parties substantial time, and of course alleviates a substantial burden from the Court in having to administer this, in essence, 2,600 plaintiff litigation.

63.    Additionally, approving the settlement will get money into the hands of the DOC employees who have been patiently waiting for over 3 years.

64.    Seriousness of the litigation risks- While both sides are confident that they would prevail in a full litigation, each side bears litigation risk.

65.    As to the Plaintiffs, their risks include but are not limited to: (1) the Court determining that the Defendant's payment of overtime was not untimely within the meaning of

the FLSA; (2) that Assistant Deputy Wardens and Captains are not eligible for FLSA overtime due to exemptions; (3) that the threshold at which overtime begins to accrue is 43 as opposed to 40 hours; (4) not being able to establish the full amount of unpaid overtime (and the attendant liquidated damages) in the absence of time and payroll records concerning same; (5) the Court determining that the DOC's actions were not willful (in light of, *inter alia*, the pandemic) and thus nullifying any liquidated damages; (6) the Court finding that the DOC is entitled to certain offsets like meal breaks; (7) the Court finding that Plaintiff Malcolm was not damaged with respect to his retaliation claim; and (8) the Court decertifying the nearly 2,600 member collective resulting in oppressive, costly, and years' long litigation.

66.     As to the DOC, their risks include but are not limited to: (1) that Assistant Deputy Wardens and Captains are eligible for FLSA overtime; (2) that the threshold at which overtime begins to accrue is 40 as opposed to 43 hours; (3) the Court determining that the DOC's actions were willful; (4) the Court determining that the DOC's calculations/offsets are understated and/or inappropriate and that the DOC owes more than it is paying in the settlement; (5) that Plaintiffs could be awarded a higher amount of liquidated damages and/or unpaid overtime due to the DOC's absence of records (giving the Plaintiffs a rebuttable presumption regarding their late/unpaid overtime) and the testimony of the opt-in Plaintiffs; (6) the Court finding that Plaintiff Malcolm is entitled to additional damages for, *inter alia*, emotional distress; and (7) the administrative and cost burden of an approximately 2,600 member collective.

67.     <u>Arms-length negotiations-</u>  The instant settlement it the result of arm's length bargaining between multiple sets of experienced counsel.

68.     Initial settlement conversations in this action were conducted by the Law Offices of Jason L. Abelove and the Law Office of Paul A. Pagano, P.C., both attorneys with substantial

experience in wage and hour litigation including class and collective actions, on behalf of Plaintiffs and Kami Barker, Esq., a Senior Litigation Counsel for Corporation Counsel with substantial experience in class actions and collective wage & hour claims on behalf of the DOC.

69.     Once Corporation Counsel was substituted out, Felice Ekelman, Esq. and Adam Gross, Esq. of Jackson Lewis, one of the pre-eminent employer side law firms in the country, took over representation for the DOC while Mr. Abelove and Mr. Pagano continued to represent Plaintiffs along with the assistance of Mr. Pollack.

70.     On December 12, 2023, Mr. Abelove and Mr. Pagano on behalf of Plaintiffs and Ms. Ekleman and Mr. Gross on behalf of the DOC engaged in a day-long mediation with the assistance of Darren Rumack, Esq., a Court appointed mediator.  In addition to being a mediator, Mr. Rumack has his own practice which focuses on representation of employees and employers in all forms of employment law (including FLSA and New York Labor Law wage and hour litigation, workplace discrimination, hostile work environment, harassment, and workers' compensation).

71.     The instant settlement was the product of several months of negotiation between five attorneys and a mediator/attorney.

72.     <u>Absence of fraud or collusion</u>- The proposed settlement is not the product of fraud or collusion.  Instead, the settlement is the product of months' long negotiations between five attorneys.  Beyond that, Mr. Rumack, a Court appointed mediator with substantial experience in the exact subject of the litigation was instrumental in helping the parties reach a resolution.  Yet still, the settlement awards represent figures which, when compared with the potential range of settlement for each claim, demonstrate an absence of fraud or collusion.  Finally, the settlement is publicly filed allowing, *inter alia*, the Court to review all its material terms and approve it.

73.    <u>No inappropriate provision</u>- In addition to meeting all of the fairness factors, the settlement agreement does not contain any inappropriate provisions.  More particularly, there is no general release (only limited releases), there is no confidentiality provision, and there is no non-rehire provision.

<u>**ATTORNEYS FEES' AND COSTS**</u>

74.    As set forth in Plaintiffs' memorandum of law, Plaintiffs' counsel seeks the return of their out-of-pocket expenses as well as 1/3 of the Gross Sum less their expenses.  Also as set forth in Plaintiffs' memorandum of law, such sums are routinely granted.

75.    The factors the Courts look at in determining the appropriateness of attorneys' fees include: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

76.    <u>Time and labor expended by counsel</u>-  Among the tasks Plaintiffs' counsel completed for this matter so far were: (1) having discussions with the lead Plaintiffs and drafting the initial complaint; (2) drafting discovery demands and initial disclosures; (3) obtaining conditional certification; (4) retaining a third party vendor at counsel's cost to send out over 12,000 notices to potential opt-ins; (5) personally cataloguing, redacting, processing and filing almost 2,600 opt-in forms; (6) amending the first amended complaint and overcoming a related motion to dismiss which had the impact of restoring liquidated damages to the litigation and adding an additional year of potential damages; (7) analyzing thousands of lines of payroll data; (8) engaging in settlement negotiations for months on end with two sets of defense counsel; (9) engaging in a successful day long mediation; (10) drafting and executing the settlement agreement; and (11) drafting and filing the instant approval motion.

77.     When taking into account all of the work performed by Plaintiffs' counsel a total of 713.80 hours has been spent up to the submission of this motion.

78.     After the settlement is approved Plaintiffs' counsel conservatively anticipates another 100 hours to obtain fulsome payroll data for distribution calculations, to finalize distribution calculations, to answer questions from the approximately 2,600 member collective regarding the settlement and to work with Analytics Consulting LLC to administer the settlement including resolving any disputes from Settlement Plaintiffs who challenge their particular allocation.  When another 100 hours are added for post-approval work the anticipated total number of hours will be 813.80.  All in, total fees will be approximately $406,900.00 represented by (813.80 hours at $500 per hour).

79.     Additionally, prior to my joining this matter as Plaintiffs' counsel, Mr. Pagano worked with another attorney ("Former Counsel").  Former Counsel has asserted that he has a right to a portion of the attorneys' fees on this case.  Without taking a position at this juncture, I have asked Former Counsel's attorney to have Former Counsel provide a declaration substantiating his time so same could be submitted in connection with this application.  Former Counsel has refused to do so.  His attorney however represents that he spent 79 attorney hours on this matter.  I have included these hours in the above calculations.

80.     In my almost 30 years of practice, I have represented numerous clients on labor and employment matters in formal litigation and arbitration.  I am AV rated by Martindale-Hubbell, and for the past 7 years have been named as a "Super Lawyer".  I also presently serve on the Board of Directors of Nassau University Medical Center.

81.     I have litigated over 100 employment matters in the Eastern District alone.  Amongst these cases, I have obtained successful verdicts in the matters of *Perks v. Town of Huntington (*99-cv-4811); *Calabro v. Nassau County Medical Center* (06-cv-0094), *Meder v. Department of*

*Education*  (06-cv-0504), *O'neill v. Sachem Central School District* (07-cv-3416)*; and*

*Vanacore v. Expedite Video* (14-cv-06103) in the Eastern District alone.

82.     I also have the following reported decisions:   Vanacore v. Expedite Video

Conferencing Servs., 792 F App'x 130 (2nd Cir 2020]); Trujillo v. Transperfect Global, Inc.,

164 AD3d 1161 (1st Dept 2018); Kiernan v. Town of Southampton, 734 Fed. Appx. 37

(2nd Cir. 2018); Brown v. Showtime Networks, 394 F. Supp 3d (2019); Perks v. Town of

Huntington 2007 U.S. App. Lexis 11070; Fusco v. Fusco 829 N.Y. S.2d 138 (2nd Dept. 2007);

Lloyd v. Cardiology & Defense Med. of Long Is. 2007 N.Y. Misc. Lexis 5988; Calabro v.

Nassau Univ. Med. Ctr. 424 F.Supp.2d 465 (E.D.N.Y. 2006); Perks v. Town of Huntington 251

F. Supp. 2d 1143 (E.D.N.Y. 2003); Brand v. Lipton 289 A.D.2d 275 (2nd Dept. 2001); Long

Island Ass'n for AIDS Care v. Green, 269 A.D. 2d 430 (2nd Dept. 2000); Perks v. Town of

Huntington 96 F. Supp. 2d 222 (E.D.N.Y. 2000); Peterson v. Long Island Railroad Co. 2012

U.S. Dist. Lexis 8504 (E.D.N.Y. 2012); Deskcenter USA, Inc. v. Deskcenter Solutions, AG

2016 U.S. Dist. Lexis 27381; Scordo v. Cool Fish Co. 2015 U.S. Dist. Lexis 80020; Goldman &

Assoc., LLP v. Golden 115 A.D. 3d 911 (2nd Dist. 2014); Rizzo v. Kraus Organization; 2010

U.S. Dist. Lexis 57615; Meder v. N.Y. City Dept. Of Education 334 Fed. Appx 296 (2nd Cir.

2009); Sklavos v. First National Bank of Long Island 134 Ad. 1070 (2nd Dist. 2015);

McKinnon Doxsee Agency, Inc. v. Gallina 2011 N.Y. Misc. Lexis 6711; and Rosa v. Levison

25 Misc. 3d 1207 (2nd Dept. 2009)

83.     Another matter I am currently litigating is *Caccavale et al v. Hewlett-Packard*

*Company a/k/a HP Inc. et al,* docket number 20-cv-00974 in the United States District Court for

the Eastern District of New York.  There plaintiffs have sued various Hewlett Packard

companies as well as Unisys Corporation for, *inter alia*, failure to pay overtime wages timely in

accordance with NYLL § 191(1)(a) and failure to pay overtime wages timely in violation of the prompt payment requirement of the FLSA. The undersigned along with Mr. Pagano represents hundreds of potential plaintiffs.

84.     I also recently settled the certified class action matter of *Valdez v. Michpat* 20-cv-2570, which predominantly focused on New York labor Law §191 claims as well as FLSA timeliness claims.

85.     Attached hereto as Exhibit 9 are my billing records for this matter.

86.     <u>Litigation's magnitude and complexity</u>- The size and difficulty of the issues in a case are significant factors to be considered in making a fee award.

87.     The instant matter is of a much larger magnitude and is substantially more complex than a traditional one employee FLSA claim.

88.     For one, there are 24 named Plaintiffs and nearly 2,600 opt-in Plaintiffs.

89.     For another, the Settlement Plaintiffs are spread across various departments at Rikers Island and three job titles (Assistant Deputy Warden, Captain and Correction Officer) which brings into play, *inter alia*, an analysis of whether they are all similarly situated and the potential application of various exemptions from overtime.

90.     Further, the Settlement Plaintiffs are employees of the State of New York which brings in issues of when overtime begins to run (over 40 hours in a week versus over 43 hours in a week).

91.     Yet still, the Settlement Plaintiffs are unionized bringing in issues of contractual overtime versus FLSA overtime.

92.     Moreover, the Defendant raised issues of offsets including offset for meal periods which needed to be analyzed.

93.    Beyond that, Defendant produced thousands of lines of data which needed to be analyzed to arrive at appropriate damages figures.

94.    Also, during the pendency of the litigation the DOC was represented by two separate sets of counsel, one after the other, a fact which had the consequence of lengthening and complicating the litigation and negotiations.

95.    Last, but not exhaustively, not all of the settlement sum comes from one entity, *to wit*, liquidated damages come from one portion of the City while back wages comes from another; another factor which complicated the negotiations.

96.    The foregoing complex and unresolved factual and legal questions demonstrate this is not a relatively straight forward wage and hour case and supports approval of Plaintiffs' counsel's attorneys' fees and costs request.

97.    <u>Risks of litigation-</u>  Plaintiffs' counsel agreed to prosecute this action without any assurance of payment for their services, or reimbursement of the substantial expenses, litigating this case on a wholly contingent basis in the face of significant risk.

98.    The retainer agreement signed by the Named Plaintiffs and the opt-in forms reflect the contingency fee arrangement.

99.    Plaintiffs' counsel entered into a contingency fee arrangement knowing that there was a very real possibility of an unsuccessful outcome and, thus, no fee of any kind.  The risk was particularly acute given the numerous factual issues outlined above and that Plaintiffs' counsel was litigating against the City of New York which has unlimited resources.

100.    Further, the Law Offices of Jason L. Abelove, the Law Office of Paul A. Pagano, P.C. and the Law Offices of Yale Pollack, P.C. are solo attorney firms meaning that a case of this

magnitude is a primary focus of the practice and there are no other attorneys to work hourly cases to offset the risks of contingency fee work.

101.    Plaintiffs' counsel stood to gain nothing in the event the case was unsuccessful. However, Plaintiffs' counsel takes on difficult cases like this one because we believe that they are important as many individual workers may be unwilling or unable to front the costs of litigation for an outcome that is uncertain and as the employees' own unions turned them down with nowhere else to turn.

102.    <u>Quality of the Representation</u>- In ascertaining the quality of the representation Courts look at, *inter alia*, the recovery obtained and the backgrounds of the lawyers involved in the lawsuit.  As set forth above, the recovery obtained, $6,200,000, is substantial.

103.    As to my background, I am a graduate of Pepperdine University School of Law with 30 years of litigation experience the majority of which focuses on wage and hour litigation. I have run my own practice for the last 28 years.  As set forth in their declarations, Mr. Pagano and Mr. Pollack are similarly accomplished.  Both Mr. Pagano and I have substantial experience in prosecuting and defending wage and hour class and collective actions obtained via cases such as the instant matter, *Connors et al v. American Medical Response, Inc. et al* under docket number 20-cv-05046 in the United States District Court for the Southern District of New York and *Caccavale et al v. Hewlett-Packard Company a/k/a HP Inc. et al* under docket number 20-cv-00974 in the United States District Court for the Eastern District of New York.

104.    Further, both Mr. Pagano and I have presented on pressing topics in wage and hour litigation.

105.    Finally, the best gauge of the quality of the Plaintiffs' counsels' representation is the full-throated endorsement of the lead Plaintiffs.  Attached hereto are declarations of 16 of the

Named Plaintiffs who express their approval of the settlement and their gratitude for Plaintiffs' counsel's work in light of the fact that their own unions would not help them.

106.    <u>Fee is reasonable in relationship to the settlement</u>- Plaintiffs' counsels' request for one-third of the Gross Sum is reasonable and consistent with the norms of FLSA collective litigation in this circuit.

107.    Further as set forth in Plaintiffs' memorandum of law, Plaintiffs' counsels' fees should be calculated as a percentage of the full amount of money that the settlement made available.  Notably, the instant settlement is not a claims made settlement but rather *every single Settlement Plaintiff will participate.  There is no reversionary amount and attorneys' fees will only come out of liquidated damages leaving back wages untouched.*

108.    <u>Public policy considerations</u>- Public policy considerations weigh in favor of granting Plaintiffs' counsels' requested fees.  As set forth in the concurrently submitted approval motion, Courts in the Second Circuit take into account the social and economic value of large-scale actions, and the need to encourage experienced and able counsel to undertake such litigation.  Here, Plaintiffs' counsel successfully negotiated a settlement that obtained significant monetary compensation for the Settlement Plaintiffs when their own unions refused to help them.  Plaintiffs' counsel should not be disincentivized from helping others by having their agreed upon fee reduced.

## <u>CLAIMS ADMINISTRATOR</u>

109.    Plaintiffs' counsel worked with Analytics Consulting, LLC in distributing and processing notice to the collective members in this action.  As evidenced by, *inter alia*, the number of people who submitted claim forms, approximately 2,600, and the absence of any complaints it did a very good job.  In light of same, Plaintiffs' counsel seeks to have Analytics Consulting, LLC

be the claims administrator for the settlement.  Attached hereto as Exhibit 5 is a true and correct copy of Analytics Consulting, LLC's proposal in connection with administering the settlement.

## **PROPOSED ORDER**

110.    Attached hereto as Exhibit 10 is a proposed approval order.

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and correct.

**WHEREFORE,** for the reasons set forth in Plaintiffs' concurrently submitted memorandum of law, Plaintiffs' request for approval of the settlement agreement should be granted.

Dated: July 15, 2024
        Garden City, New York

                                Law Offices of Jason L, Abelove, P.C.

                                By:  _____*Jason L. Abelove*_____
                                Jason L. Abelove, Esq.
                                *Attorneys for Plaintiffs*
                                666 Old Country Road, Suite 303
                                Garden City, NY 11530
                                (516) 222-7000